**SPORTMART, INC., et al., Plaintiffs-Appellants,**

v.

**WOLVERINE WORLD WIDE, INC., et al., Defendants-Appellees.**

No. 78–2053.

United States Court of Appeals, Seventh Circuit.

Argued April 3, 1979.

Decided July 2, 1979.

Ralph A. Mantynband, Chicago, Ill., for plaintiffs-appellants.

Charles Donelan, Worcester, Mass., for defendants-appellees.

Before PELL and WOOD, Circuit Judges, and HOFFMAN, Senior District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

This case comes before this court on the plaintiff's appeal from the trial court's denial of a motion for entry of a rule upon the defendant, Henri Patty, to show cause why he should not be held in contempt for violation of an earlier judgment of the court. The controversy turns on the proper construction of a consent decree which had been signed by the parties and approved by the trial court. We note jurisdiction and, finding no error, affirm.

I.

In 1973, Sportmart, Inc., and its subsidiary, Olympic Distributors, Inc., [hereinafter referred to collectively as Sportmart] filed a complaint against Wolverine World Wide, Inc., Skis Rossignol, S.A. [Skis Rossignol], Rossignol Ski Company, Inc. [Rossignol], and the appellee, Henri Patty, among others. The complaint alleged that the defendants had violated the antitrust laws by conspiring to fix the retail prices of certain sporting goods. Sportmart is a major retailer of sporting goods in the Chicago area. The defendants are or were involved in the manufacture and distribution of Rossignol skis, Trappeur ski boots, and Kerma ski poles. Skis Rossignol is a French corporation which manufactures the ski equipment. Wolverine World Wide is a former distributor, and Rossignol a present distributor of Skis Rossignol's products in the United States. The defendant, Patty, the only defendant involved in this appeal, was first an employee of Wolverine World Wide and then sometime in 1973 became a vice-president in charge of marketing and distribution for Rossignol. The plaintiffs' complaint charged Patty as well as the other defendants with directing the distribution of Rossignol ski products and refusing to

---

* The Honorable Walter E. Hoffman, Senior District Judge for the Eastern District of Virginia, is sitting by designation.

sell them to Sportmart unless Sportmart agreed to resell the products at certain retail prices.

In 1974, the parties to the suit compromised by entering into a consent degree which was approved by Judge Marshall. In return for the dismissal of plaintiffs' complaint with prejudice, Rossignol agreed, *inter alia,* to "sell, for a period of five (5) years from the date of this order, all lines and all brands of skis and related equipment dealt in by ROSSIGNOL to the plaintiffs." All parties to the litigation signed the order through their counsel.

In 1976, Sportmart filed a motion in the district court for an order directing Rossignol, Skis Rossignol, and Patty to show cause why they should not be held in contempt. The motion charged that "the defendants Rossignol and its officers including defendant Henri Patty and Ski Rossignol . . entered into an arrangement [with a ski boot manufacturer] to take over U.S. distribution of Nordica boots" and refused to sell them to Sportmart. The vehicle used to distribute the new line, the motion charged, was R.N.C., Inc., [RNC]. Moreover, Henri Patty was "vice president of both the defendant Rossignol . . . and R.N.C., Inc., and would supervise their marketing structure."

After responses were made by the defendants, the district court found that Rossignol owned fifty percent of the stock of RNC, but required further development of facts on whether Rossignol controlled the new company in fact. Nevertheless, the court cautioned the defendants that it would "not tolerate frustration of the consent order by a subterfuge." Subsequently, a new consent decree was negotiated by the parties and approved by the trial court. The second decree contained, as did the first, a disclaimer by the defendants of any admission of wrongdoing. The decree provided:

> Rossignol Ski Company, RNC, Inc., Skis Rossignol, S.A., and Henri J. Patty, each have agreed that they will sell for a period of five years from the date of this order (which period of time shall include the 1980–81 ski selling season) all lines and brands of all skis, boots, poles, bindings and related ski equipment dealt in by them, to the plaintiffs for resale at any location owned or operated by the plaintiffs, whether now existing or to be opened in the future in the Chicago market or elsewhere. . . . Each of the aforesaid shall fill orders received by any of them from the plaintiffs and shall follow regular and ordinary procedures in delivering merchandise to the plaintiffs.
>
> · · ·

The agreement was signed for Rossignol, Skis Rossignol, and Patty by their attorney. No signature for RNC appears on the face of the document.

In 1978, Sportmart filed yet another motion to show cause in the district court, this time solely against Patty. The motion complained of the failure to Patty to sell Garmont ski boots to Sportmart. The facts concerning the events subsequent to the 1976 consent decree were developed by affidavits submitted by the parties. Garmont, S.P.A., is an Italian company which manufactures Garmont ski boots. Prior to 1977, these boots were distributed in the United States by a company unrelated to any of the parties to this action. Sportmart had been a purchaser of the boots. Garmont competed in the same market as Trappeur and Nordica boots. In June 1977, Patty terminated his association with Rossignol and RNC and became the president and one-third stockholder in a new company, Garmont, U.S.A., which soon became the exclusive U.S. distributor of Garmont boots. There is no indication in the record that either Garmont firm has any relation or affiliation whatsoever with Rossignol, Skis Rossignol, or RNC. In early 1978, Garmont, U.S.A., terminated its dealership arrangement with Sportmart.

## II.

██ As a preliminary matter before addressing the merits, we note our jurisdiction to hear this appeal under 28 U.S.C. § 1291. A denial of a motion for civil contempt made during the course of litiga-

tion before the trial court ordinarily would not be immediately appealable; the aggrieved party must wait until final judgment before prosecuting an appeal. *See Union Tool Co. v. Wilson,* 259 U.S. 107, 110–11, 42 S.Ct. 427, 66 L.Ed. 848 (1922). In contrast, most post-judgment orders are final decisions within the ambit of 28 U.S.C. § 1291 as long as the district court has completely disposed of the matter. In the present case, the consent decree "operated as a final judgment. Therefore, because the motion for contempt was denied after this 'judgment' . . . and no further action by the district court was necessary to quicken the denial, the action by the district court is final and therefore reviewable." *Sanders v. Monsanto Co.,* 574 F.2d 198, 199 (5th Cir. 1978). *See Davis v. Board of School Commissioners,* 517 F.2d 1044, 1052 (5th Cir. 1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976); *Gilbert v. Johnson,* 490 F.2d 827, 829 (5th Cir. 1974); *Stringfellow v. Haines,* 309 F.2d 910, 911 (2d Cir. 1962).

### III.

The bulk of the cases and commentary concerning the construction of consent decrees have involved decrees negotiated between the government and a private antitrust defendant. *See, e.g., United States v. ITT Continental Baking Co.,* 420 U.S. 223, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975); *United States v. Armour & Co.,* 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971); *United States v. Atlantic Refining Co.,* 360 U.S. 19, 79 S.Ct. 944, 3 L.Ed.2d 1054 (1959); *Hughes v. United States,* 342 U.S. 353, 72 S.Ct. 306, 96 L.Ed. 394 (1952); Handler, *Twenty-Fourth Annual Antitrust Review,* 72 Colum.L.Rev. 1, 19–34 (1972); Note, *Flexibility and Finality in Antitrust Consent Decrees,* 80 Harv.L.Rev. 1303 (1967). While this case involves a consent decree between private litigants, we see no reason why the rules on the construction of consent decrees enunciated by the Supreme Court in the cases above should not govern the issue which confronts the court here.

In *United States v. Armour & Co.,* 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971), the Supreme Court held that consent decrees should be treated as contracts for purposes of construction. Rejecting the government's argument that the consent decree should be construed to prevent the same kinds of anticompetitive practices or effects that the government sought to enjoin in its complaint, the Court stated:

> Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it. Because the defendant has, by the decree, waived his right to litigate the issues raised, a right guaranteed to him by the Due Process Clause, the conditions upon which he has given that waiver must be respected, and the instrument must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation.

*Id.* at 681–82, 91 S.Ct. at 1757. The Court, however, later disclaimed any rigid rule that would preclude any resort to extrinsic evidence to explain the meaning of a consent decree in case of doubt:

> Since a consent decree or order is to be construed for enforcement purposes basically as a contract, reliance upon certain aids to construction is proper, as with any

other contract. Such aids include the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree. Such reliance does not in any way depart from the "four corners" rule of *Armour.*

*United States v. ITT Continental Baking Co.,* 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975).

Sportmart frames the issue as whether the consent decree bound Henri Patty in his individual capacity or solely in his agency capacity as an employee of Rossignol and RNC. Sportmart argues that the second consent decree is clear and unambiguous on its face on this point and clearly requires Patty to sell it any and all ski equipment that he deals in. Sportmart maintains that the language "Rossignol Ski Co., RNC, Inc., Skis Rossignol, S.A., and Henri J. Patty *each* have agreed that they will sell . . all lines and brands of skis, boots, poles, bindings and related ski equipment dealt in by them. . . ." unequivocally binds each person or entity to sell ski equipment to Sportmart. Its brief states: "The word 'each' is commonly understood to mean everyone of the two or more individuals composing the whole, consider[ed] separately from the rest." Sportmart bolsters this construction by pointing to another sentence in the same paragraph of the decree which provides: "*Each* of the aforesaid shall fill orders received by any of them from the plaintiffs. . . ." We, however, agree with Patty that the issue is not Patty's capacity as a signatory to the consent decree. Instead, we view the issue as what did each party, including Patty, agree to sell to Sportmart. As to this question we find the decree ambiguous. Each agreed to sell and fill orders for all ski equipment "dealt in by *them.*" The decree does not contain language expressly requiring the sale of all equipment "dealt in by any of them" or "dealt in by each of them." At the time of the negotiation of the consent decree, Rossignol, RNC, Skis Rossignol, and Patty could be regarded as essentially one interrelated group, and the decree does not

on its face indicate any clear intent to bind Patty to sell ski equipment completely unrelated to the Rossignol group. Thus, the ambiguity of the decree's application to the present case is plain and resort to the circumstances surrounding the formation of the consent decree in order to construe its terms, if ambiguity be necessary at all before resort to such extrinsic aids, is proper.

Sportmart maintains that the circumstances surrounding the negotiation of the second consent decree indicate that the parties intended that the decree bind Patty to sell all ski equipment that he dealt in no matter what the equipment's relationship to the Rossignol group. Sportmart's initial complaint named Patty as a co-conspirator who through Wolverine and Rossignol allegedly violated the antitrust laws. Moreover, the motion that led to the second consent decree arose because of Patty's conduct in association with RNC. Yet, in each cf these instances, the connection with Rossignol group was present and this element, which the trial judge necessarily found decisive, is absent in Patty's marketing of Garmont boots.

We agree with the district court's conclusion that the second consent decree was intended only to require the sale of Rossignol-related products. Sportmart's complaint complained essentially of a conspiracy to fix the prices of "Rossignol ski products" and the injunctive relief prayed for related only to Rossignol products. The first consent decree required Rossignol to sell Sportmart "all lines and all brands of all skis and related equipment dealt in by ROSSIGNOL. . . ." Sportmart's motion which culminated in the second consent decree essentially charged Rossignol with setting up RNC as a dummy corporation to market Nordica boots and placing Patty in control of RNC as its agent. We view the broadening of the language of the second consent decree to cover ski equipment "dealt in by them" as an attempt to prohibit the kind of transparent device that was apparently used by Rossignol to avoid the mandate of the first consent decree.

It is true that the second decree, unlike the first, obligated Patty as well as the corporate entities to sell to Sportmart, but the context in which the negotiations took place explain the reason why Patty was individually named. When Sportmart filed its complaint, RNC did not exist. It was a party to neither the action nor the first consent decree. Thus, when Sportmart sought to force RNC to sell to it by petitioning the district court to hold Rossignol, Skis Rossignol, and Patty in contempt, there was a problem in obtaining relief that would bind RNC. The device that was apparently chosen was to obligate Patty who was a party both to the original action and to the first consent decree to sell to Sportmart.[1] Patty was the vice-president for marketing of RNC and admittedly in control of the corporation's sales policies. Thus, he was named along with RNC to ensure a decree enforceable against RNC.

The parties to the negotiations thus focused their attention on ensuring continuity of the sale of Rossignol manufactured or distributed products to Sportmart. Patty had been closely associated with the distribution of the Rossignol lines since before the commencement of Sportmart's lawsuit. It was apparently never contemplated that he would split with Rossignol and join forces with a competitor. We hold that the decree obligating Rossignol, RNC, Skis Rossignol, and Patty to sell all ski equipment "dealt in by them" did not require Patty to sell Sportmart the equipment dealt in by a competitor of Rossignol who was unrelated to the prior problems.

Sportmart complains that it named Patty as a principal in its first complaint and that the district court's refusal to hold Patty in contempt will permit him to engage in the same anticompetitive behavior that Sportmart initially sought to enjoin. The fact is, however, that "the instrument must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation." *United States v. Armour,* 402 U.S. at 682, 91 S.Ct. at 1757. Moreover, this court's adoption of Sportmart's interpretation would have the practical effect of forcing Garmont, which was neither a party to this action nor Rossignol controlled, to comply with the terms of the consent decree. We think that the district court's interpretation of the consent judgment is more consistent with the rule that "[i]n contempt proceedings for its enforcement, a decree will not be expanded by implication or intendment beyond the meaning of its terms . . ., and the facts found must constitute a plain violation of the decree so read." *Terminal R.R. Association v. United States,* 266 U.S. 17, 29, 45 S.Ct. 5, 8, 69 L.Ed. 150 (1924).

One commentator has suggested that "what the courts are really saying is that injunctive decrees . . . are the types of legal instruments that should, as a general rule, be given a narrow, albeit a fair, reading." Handler, *Twenty-Fourth Annual Antitrust Review,* 72 Colum.L.Rev. 1, 24 (1972). The district court's interpretation, although narrow, is fair. Judge Marshall was familiar with the case. He has presided over it ever since shortly after its commencement. We see no reason to disturb his judgment on review. If, as the trial judge noted, Sportmart still feels aggrieved by Patty's marketing strategy for Garmont boots, its remedy is to sue Garmont, not to bootstrap it indirectly into this lawsuit.

AFFIRMED.

---

1. The face of the second consent decree is consistent with this interpretation of the reason for obligating Patty to sell. Although the body of the decree obligates RNC, RNC is not a signatory to the decree.