**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Roland G. HUEBNER, William Huebner,**
**and Petenwell Potato Farms,**
**Defendants-Appellants.**

**No. 83–3140.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 12, 1984.
Decided Jan. 11, 1985.

Donald T. Hornstein, Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Arvid A. Sather, Michael, Best & Friedrich, Madison, Wis., for defendants-appellants.

Before BAUER, Circuit Judge, PELL, Senior Circuit Judge, and DUPREE, Senior District Judge.[*]

BAUER, Circuit Judge.

In 1978, pursuant to litigation commenced under the Clean Water Act (CWA), 33 U.S.C. § 1251 *et seq.* (1978), by the United States Army Corps of Engineers (Corps), defendants Roland G. Huebner, William Huebner and the Petenwell Potato Farms (Huebners), entered into a consent decree with the Corps regarding the maintenance of the wetlands on their property. In 1983, following a six-day hearing, the district court found the Huebners in contempt of the 1978 order and ordered them to comply with a restoration plan developed by the Corps. The Huebners appeal the lower court's contempt order and restoration plan. We affirm the district court's finding of contempt, reverse the district court's restoration order and remand with instructions.

## I. FACTS

In 1977, the Huebners, owners of a 4,000 acre vegetable farm, acquired "Bear Bluff Farms," a 5,000 acre property in Jackson County, Wisconsin, the largest continuous area of wetlands in Wisconsin. The wetlands on Bear Bluff provide a habitat for wetland foliage and wildlife, and moderate the flow of water to surrounding wildlife refuges by absorbing excess stream flow in periods of high water and releasing water during the dry season.[1]

Since the turn of the century Bear Bluff has been used intermittently for a variety of agricultural purposes, including the production of dryland crops, such as corn and oats. For the twenty years preceding the Huebners' ownership, however, only cranberries have been grown on the land. Cranberry cultivation requires a constant supply of water to protect against frost, to flood the berries for harvesting, to mulch them in the winter and to irrigate them in the growing season.[2] When the Huebners acquired Bear Bluff, the farm included three cranberry beds, including a fifty-seven acre cranberry bed called the Staege bed on the southern part of the property. The Staege bed was served by three diked reservoirs: the Hunter's Peak, Juleane and Unnamed Reservoirs. The record indicates that the Huebners intended to expand the cranberry operations of Bear Bluff Farms and to use a portion of the farm for growing vegetables and other upland crops.

In 1977, the Huebners began to plow sections of the farm to clear out existing ditches and dig new ones. On September 2, 1977, the St. Paul District of the United States Army Corps of Engineers issued several cease and desist orders to the Huebners, alleging that their ditching activities constituted a permitless "discharge of

---

[*] Honorable Franklin T. Dupree, Jr., Senior District Judge for the Eastern District of North Carolina, is sitting by designation.

1. The Wisconsin wetlands are characterized by a layer of sphagnum moss overlaying a varying depth of Dawson peat and Palms muck which rest on gray siliceas sand. Generally the area is comprised of large exposures of sedge meadows, interspersed with shrub swamp, occasional upland areas and bogs. The area is generally vegetated with black spruce and heath species. Beggar-tick, smartweeds and crabgrass grow near the reservoirs, while coontail, pondweed and grass grow in the ditches. Sandhill cranes, sharptailed grouse, Canadian geese, and raptors, such as marsh hawks, roughlegged hawks and short-eared owls, feed and nest in the wetlands.

White tailed deer and other furbearing mammals also use the wetlands for fawning and browsing. Schools of bullheads travel the ditches. R. 34, 35 & 49.

2. The Amicus Curiae brief of the Wisconsin Cranberry Growers Association indicates that Wisconsin leads the nation in the production of cranberries, which grow well in the inland wetlands of that state. Of the 110,000 wetlands acres owned by Wisconsin cranberry farmers, only 6% of the total acreage is developed into beds where cranberry plants are grown. The remaining 94% of acreage contains each cranberry bog's water control system through which water is supplied to the beds by means of reservoirs, dikes, dams, ditches, canals, bulkheads, pumps, and sprinklers.

dredged or fill material" into the Bear Bluff wetlands in violation of section 301 of the Federal Water Pollution Control Act, 33 U.S.C. § 1311 (1976), renamed the "Clean Water Act" in 1977.[3] On November 10, 1977 the Corps filed a complaint in the district court seeking a permanent injunction and a financial penalty against the Huebners. In June, 1978 the parties settled the action by entering into a consent decree approved by District Judge James E. Doyle.

Paragraphs 1 and 2 of the ten paragraph order are most significant for purposes of this appeal. Paragraph 1 permanently enjoins the Huebners "from any and all operations which constitute the discharge of dredged or fill material into waters of the United States, including wetlands within the . . . described area of Jackson County, Wisconsin . . . except as in accordance with a Department of Army permit and other lawful authority." Paragraph 2 requires that the Huebners notify the Corps "in writing, twenty (20) days prior to the commencement of any discharge of dredged or fill material on any portion or portions of the land described in paragraph 1," so that the Corps could "notify the defendants, in writing, of the need for the Department of Army permit as to the stated sites."

Paragraphs 4, 5 and 7 relate principally to the restoration and continued maintenance of wetlands in the Hunters Peak, Juleane and Unnamed Reservoirs. Paragraphs 4 and 5 describe certain restoration and maintenance activities to be performed by the Huebners on culverts, embankments and ditches, which activities would restore the ditches and dikes to the dimensions existing prior to the dredging that prompted the order. Paragraph 7 requires the Huebners to "maintain and operate the control structures and reservoirs referred to in paragraph 4 above in a safe manner, for maximum drainage control, and to protect the integrity of the dikes and the structures therein."[4]

The Huebners complied with the immediate restoration provisions of the consent order. On November 16, 1982, however, the government moved for an order to show cause why the Huebners should not be held in contempt for violating the 1978 order. The government, through its affidavits, charged that dredged material had been placed on the sides of Beaver Creek and was sliding into the adjacent wetlands, that a portion of the wetland had been plowed and furrowed by a marsh plow, and that the dikes of the Hunter's Peak, Juleane and Unnamed Reservoirs had been leveled and scraped by a bulldozer without notice to the Corps and without any Corps permit allowing such activity. The Huebners had planted barley in a plowed portion of the Hunter's Peak, and stated that they intended to plant corn.[5]

The district court adopted the government's "proposed finding of fact" as "preliminary findings of fact" on January 17, 1983, and held evidentiary hearings for six days, in April and May of 1983. On August 4, 1983 the district court entered an order holding the Huebners in civil contempt of the court's 1978 consent order on the grounds that the government had proved by "clear and convincing evidence" that the Huebners had made permitless

---

3. See S.Rep. 1236, 92nd Cong.2d Sess. 99 (1972), U.S.Code Cong. & Admin.News 1972, p. 3668, *reprinted in* Environmental Policy Division of the Congressional Reference Service, 1 A Legislative History of the Water Pollution Control Act Amendments of 1972 at 282 (Comm. Print 1973) (hereinafter "Legislative History"). In 1977, Congress approved the shortened "Clean Water Act" title. H.Rep. No. 830, 95th Cong. 1st Sess. 1 (1977), U.S.Code Cong. & Admin.News 1977, p. 4326, *reprinted in* 3 Legislative History, at 185.

4. Paragraph 6 requires that the mandates of Paragraph 4 be completed by July 15, 1978.

Paragraph 3 imposes a one thousand dollar fine on the Huebners. Paragraphs 8, 9 and 10 order the Huebners not to apply for any after the fact permits, to afford Corps personnel access to their premises and to bear their own costs in the case.

5. The Huebners stated that they needed an immediate cash crop to pay for the equipment costs of their dredge and fill activities. R. 51. Cranberries take several years to become fully productive.

discharges of dredged and fill material into the Bear Bluff wetlands in violation of the 1978 order. The Huebners allege that they are not in contempt of the district court's 1978 order because the activities in which they engaged in on their land did not require a Corps permit. They allege that the district court erred in its interpretation of the agricultural exemptions of the CWA, as relevant to the 1978 consent order, in determining when permits are required. The Huebners also argue that the district court denied them due process by improperly excluding certain evidence during the contempt hearing, and that the court abused its discretion in refusing to amend the 1983 restoration plan.

## II. THE CLEAN WATER ACT

Congress enacted the CWA "to restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a) (1978). The goal of the CWA is to eliminate by 1985 "the discharge of pollutants into navigable waters." 33 U.S.C. § 1251(a)(1) (1978).

The "navigable waters" subject to Corps authority under the Act include wetlands, which have been defined as

those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs and similar areas.

33 C.F.R. § 323.2(a)(7)(c) (1983). The term "navigable waters" has been given "the broadest constitutional interpretation," 1

LEGISLATIVE HISTORY at 178 (Senate Consideration of the Conference Report on S. 2770, Oct. 4, 1972), in recognition of the fact that

[t]he regulation of activities that cause water pollution ... must focus on all waters that together form the entire aquatic system. Water moves in hydrologic cycles, and the pollution of [a] part of the aquatic system ... will affect the water quality of the other waters within that aquatic system.

42 Fed.Reg. 37,128 (1977). *See also* 2 LEGISLATIVE HISTORY at 1495 (Report of Senate Committee on Public Works).[6]

The CWA defines "pollutant" to include "dredged soil ... rock, sand, [and] cellar dirt," 33 U.S.C. § 1362(6) (1978), and establishes a permit system to control discharges of dredged material. Section 1344 of the Act authorizes the Secretary of the Army to act through the Corps to issue such permits under certain conditions and procedures.[7] The permit process is "[t]he cornerstone of the ... scheme for cleaning up the nation's waters." *United States Steel Corp. v. Train*, 556 F.2d 822, 829 (7th Cir.1977). *See also Mobil Oil Corp. v. United States E.P.A.*, 716 F.2d 1187, 1189 (7th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 2363, 80 L.Ed.2d 835 (1984); *Citizens for a Better Environment v. Environmental Protection Agency*, 596 F.2d 720, 721–22 (7th Cir.1979); *United States v. Byrd*, 609 F.2d 1204, 1206 (7th Cir.1979); *American Meat Institute v. Environmental Protection Agency*, 526 F.2d 442, 444–45 (7th Cir.1975).

The Huebners did not challenge the authority of the Corps to regulate parts of Bear Bluff Farms as wetlands in the dis-

---

**6.** Under this definition, "wetlands" have been held to include artificially created canals, *Weiszmann v. District Engineer*, 526 F.2d 1302 (5th Cir.1976); normally dry arroyos, *United States v. Phelps Dodge Corp.*, 391 F.Supp. 1181 (D.Ariz. 1975); and mangrove wetlands, *P.F.Z. Properties, Inc. v. Train*, 393 F.Supp. 1370 (D.D.C. 1975); *United States v. Holland*, 373 F.Supp. 665 (M.D.Fla.1974).

**7.** This delegation of authority to the Corps recognizes the Army Corps of Engineers' historic

role in preserving the navigability of the waterways of the United States. *See generally* Caplin, *Is Congress Protecting our Water? The Controversy Over Section 404, Federal Water Pollution Control Act Amendments of 1972*, 31 U.MIAMI L.REV. 445, 448 (1977); Ablard & O'Neill, *Wetland Protection and Section 404 of the Federal Water Pollution Control Act Amendments of 1972: A Corps of Engineers Renaissance*, 1 VT.L. REV. 51, 54–58 (1976).

trict court, but argued that their activities were exempt from the CWA's permit process under Section 1344(f)(1). The district court held that the phrase "discharge of dredged or fill material" in the 1978 consent order incorporated the legal meaning of those terms under the CWA and therefore the question of whether the Huebners' permitless activities violated the terms of the 1978 consent decree hinged on the court's interpretation of the scope of Section 1344(f)(1)'s exemptions. The district court held that "[i]t is clear that the amendments that created the subsection (f) exceptions on which defendants rely were not intended to exempt all farming operations from the permit requirements, but only those whose effect upon wetlands or other waters was so minimal as not to warrant federal review and supervision." R. 118, Order at 17–18. The court then analyzed the defendants' actions in light of the purposes of the Clean Water Act, the intent of Congress in enacting the farming excep-

tions, and the terms of the 1978 order. Our review of the legislative history confirms the conclusion reached by the lower court.

Section 1344(f)(1) provides exemptions from the permit process for discharges into wetlands caused by agricultural activities, such as plowing and the maintenance of dikes, ponds, and farm roads.[8] The exceptions of Section 1344(f)(1) are subject to section 1344(f)(2), however, which provides that discharges are not exempt from the permit process if they bring "an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced."

Our review of the legislative history of the agricultural exemptions convinces us that because of the significance of inland wetlands, which make up eighty-five percent of the nation's wetlands,[9] Congress

---

**8.** Section 1344(f)(1) provides exemptions for discharges:

(A) from normal farming, silviculture, and ranching activities such as plowing, seeding, cultivating, minor drainage, harvesting for the production of food, fiber, and forest products, or upland soil and water conservation practices;

(B) for the purpose of maintenance, including emergency reconstruction of recently damaged parts, of currently serviceable structures such as dikes, dams, levees, groins, riprap, breakwaters, causeways, and bridge abutments or approaches, and transportation structures;

(C) for the purpose of construction or maintenance of farm or stock ponds or irrigation ditches, or the maintenance of drainage ditches; [and] ...

(E) for the purpose of construction or maintenance of farm roads or forest roads, or temporary roads for moving mining equipment, where such roads are constructed and maintained, in accordance with best management practices, to assure that flow and circulation patterns and chemical and biological characteristics of the navigable waters are not impaired, that the reach of the navigable waters is not reduced, and that any adverse effect on the aquatic environment will be otherwise minimized.

**9.** Congress recognized that the protection of the waters of the United States required an "organ-

ic" concept of the national aquatic system and attempted to enact in the Clean Water Act a permit system with "no gaps" in its protective measures. 4 LEGISLATIVE HISTORY 907 (statement of Sen. Hart) (excerpts from debate on the Bentsen Amendment); *id.* at 897 (statement of Sen. Randolph during Senate Debate on S.1952, August 4, 1977). Congress purposefully included nonnavigable inland wetlands in the definition of navigable waters because of their importance in the chain of travel of toxic pollutants. 4 LEGISLATIVE HISTORY 928 (statement Sen. Muskie). "Routine farming operations release substantial quantities of contaminants including sediment, salt, nutrients, pesticides, organic materials and pathogens into our waterways. It has been estimated, for instance, by the U.S. Soil Conservation Service, that cropland is responsible for 50 percent of the total sediment entering inland waterways." 4 LEGISLATIVE HISTORY at 1062 (statement of Sen. Muskie). President Carter estimated that inland wetlands were worth "$50,000 per acre," but noted that "our economic system does not transfer this wealth to individual owners. Therefore, wetlands will continue to be destroyed until the government takes steps to protect them." *Id.* at 1251 (statement of President Jimmy Carter). Other proponents of the amendment noted that wetlands were being destroyed at the rate of 300,000 acres a year. 4 LEGISLATIVE HISTORY 882 (statement of Sen. Stafford during Senate Debate on S. 1952, August 4, 1977). The need for land for residential purposes has prompted the conversion of many wetlands. 31 U.MIAMI L.REV. 445, 491 (1977).

intended that Section 1344(f)(1) exempt from the permit process only "narrowly defined activities ... that cause little or no adverse effects either individually or cumulatively [and which do not] convert more extensive areas of water into dry land or impede circulation or reduce the reach and size of the water body." 3 LEGISLATIVE HISTORY at 420 (statement of Rep. Harsha, member of the conference committee, during House debates). *See also id.* at 474. The Fifth Circuit also has held that § 1344(f)(1) was designed to be a "narrow exemption." *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 925 n. 44 (5th Cir.1983).

■ Recognizing that "there has been widespread concern that many activities that are normally considered routine would be prohibited or made extremely difficult because of the complex regulatory procedures," 4 LEGISLATIVE HISTORY 897 (statement of Sen. Randolph), Congress enacted in the 1977 amendments a delicate balance of exceptions that protected wetlands while permitting routine activities to go on unimpeded.

> The drainages exemption is very clearly intended to put to rest, once and for all, the fears that permits are required for draining poorly drained farm or forest land of which millions of acres exist. No permits are required for such drainage. Permits are required only where ditches or channels are dredged in a swamp, marsh, bog or other truly aquatic area.

4 LEGISLATIVE HISTORY 1042 (statement of Sen. Muskie).[10] We therefore affirm the district court's narrow interpretation of the agricultural exemptions and its incorporation of the purpose of those exemptions into the finding of contempt against the Huebners for violation of the 1978 consent decree.

## III. FINDINGS AS TO SPECIFIC ACTIVITIES ON BEAR BLUFF FARMS

■ In civil contempt proceedings for violations of a consent decree, plaintiffs must prove the violations by clear and convincing evidence in the trial court. *Squillacote v. Local 248, Meat & Allied Food Wkrs.,* 534 F.2d 735, 747 (7th Cir.1976). The court's factual determinations are accorded great weight on appeal when they depend on credibility determinations based on the demeanor of witnesses at trial. *Cf. NLRB v. Cutting, Inc.,* 701 F.2d 659, 663 (7th Cir.1983). Moreover, the remedy chosen by the trial court in a contempt proceeding on a consent decree is "discretionary in character and is not to be reversed except for abuse of such discretion or unless clearly erroneous." *Walaschek & Associates, Inc. v. Crow,* 733 F.2d 51, 53 (7th Cir.1984), *quoting Jewel Tea Co. v. Kraus,* 204 F.2d 549, 551 (7th Cir.1953). Our review of the lower court's findings of fact and conclusions of law as to the particular challenged activities is guided therefore by these standards.

### A. Plowing the Reservoirs

■ The lower court found that the Huebners used a marsh plow to plow and remove wetland vegetation from the three reservoirs at sites 10, 11 and 12, and leveled the dikes in these reservoirs. The court found that the Huebners plowed the reservoirs to decrease the capacity of the soil to store water in preparation for the immediate planting of barley and for the future planting of corn and other dryland crops. The court held that in doing so the Huebners failed "to protect the integrity of the dikes" and to guarantee "maximum drainage control" in direct violation of paragraph 7 of the 1978 consent decree.

---

**10.** Answering Senator Dole's question as to whether a permit would be necessary if one or two farmers got together and dug small ditches in order to drain a low lying area to improve the production of crops, Senator Muskie responded that:

> [T]he Corps definition requires a prevalence of aquatic vegetation and is intended to describe only the true swamps and marshes that are part of the aquatic ecosystem. The type of drainage [described by Senator Dole] could be performed without discharging dredged or fill material in water or would occur in areas that are not true marshes or swamps intended to be protected by section 404.

4 LEGISLATIVE HISTORY 1042–43.

The Huebners do not deny these activities but argue that they were not required to notify the Corps or obtain a permit for the plowing of the reservoirs because the "nonfunctional and nonproductive" nature of the reservoirs required that they cease to be used as reservoirs. The Huebners claim that their activity will make the reservoirs "more effective land," and argue on appeal that "the so-called reservoirs had been cropped for decades before the unsuccessful attempt to convert this land into reservoirs in 1956." The Huebners stated purpose, however, is in direct opposition not only to the purposes of the Clean Water Act, but, more importantly, to the terms of the consent decree, which required a return to the status of the land as it had existed prior to the discharge activities which had initially prompted the 1978 order. We therefore affirm the court's finding that the Huebners were in violation of the 1978 order when they plowed the reservoirs.

### B. Cleaning, Deepening and Digging Ditches

In conjunction with the plowing of the reservoirs, the district court found that the Huebners had used backhoes to clean and deepen existing ditches at sites 1, 2 and 14 and used a dragline to excavate an approximately 400 foot long new ditch at site 3. The court found that the result of the deepening activities at sites 2 and 14 was to drain the reservoirs. The court also found that at sites 1, 2, 3 and 14 the Huebners had sidecast materials onto the wetlands, used bulldozers to spread the discharge over several acres, and formed the materials into farm roads which were broader than necessary according to best management practices.

The Huebners argue that the evidence showed that their ditches were used solely for irrigation purposes, and therefore they were exempt from the permit procedure under Section 1344(f)(1)(C), which exempts discharges related to the "construction or maintenance of irrigation ditches." The Huebners also argued that the water level in the ditches had been raised, indicating that the groundwater level surrounding the ditch was higher than it had been prior to the 1978 decree. The Huebners argued that the evidence of a higher groundwater level showed a compliance with the purposes of the 1978 order.

The district court rejected the Huebners' focus on ditch water level and looked instead to the results of Huebners' dredging activity as it affected the surrounding wetlands. We think this interpretation of the purposes of the 1978 consent order was proper. We think the government succinctly stated the fallacy of the Huebners' argument at oral argument when counsel stated that "the Clean Water Act is not a Full Ditch Act:" the water level of the ditches is not the key to compliance with the purposes of the 1978 order.

The district court correctly reasoned that even if the ditches at issue were irrigation ditches, the restrictions of Section 1344(f)(2) still applied. Under Section 1344(f)(2), the discharge of dredged materials from the construction of irrigation ditches requires a permit where such discharges "bring an area of navigable waters into a use to which it was not previously subject and where the flow of the waters is impaired and their reach reduced." The district court reasoned that the sidecasting and spreading activity reduced the reach of the wetlands surrounding the ditches at issue. The court therefore concluded that the defendants had violated the 1978 order by not giving notice of such activity and by not obtaining a permit. We affirm the court's conclusion that the Huebners' ditching activity, whether it involved irrigation or drainage ditches, ran afoul of the provisions of Section 1344(f)(2). The Huebners' activity constituted a discharge of dredged material onto a wetland, thereby disturbing the reach of its waters. Such activity required notice and application for a permit under the 1978 consent decree.

### C. Maintenance of Farm Roads

The district court found that at sites 1, 5, and 6 the Huebners bulldozed excess road fill into adjacent wetlands and maintained the roads at a greater width than neces-

sary. The Huebners argued that discharges made in connection with the maintenance of farm roads are exempt from permit requirements under Section 1344(f)(1)(E). The court concluded, however, that the Huebners' bulldozing activities violated Section 1344(f)(1)(E)'s requirement that the "best management practices" be used in the maintenance of farm roads, and reasoned therefore that the Huebners should have given notice and obtained a permit if necessary before widening the roads. We find nothing clearly erroneous in the court's conclusion and affirm the lower court's ruling that Section 1344(f)(1)(E) exemptions for discharges made in the construction and maintenance of farm roads does not apply to the Huebners' activities. The Huebners' failure to give notice and apply for a permit for these activities was a violation of the 1978 order.

D. Expansion of Cranberry Beds

The court below held that the Huebners' expansion of the Staege cranberry beds at site 9 without a permit violated both paragraphs 1 and 2 of the consent order because it found that the conversion of the adjacent wetlands into cranberry beds was a "use" of the wetlands to which they had not been previously subject, therefore requiring a permit under Section 1344(f)(2). 33 C.F.R. § 323.4(a)(1)(ii) provides:

[a]n operation ceases to be established when the area on which it is conducted has been converted to another use or has lain idle so long that modifications to the hydrological regime are necessary to resume operations.

Relying on this definition, the district court found that since the Huebners had had to drain the surrounding area in order to expand the bed, this conversion brought it within the terms of the regulation. We affirm the court's ruling.

E. Scraping Activity

Finally, the district court found that the defendants used a bulldozer to move large mounds of dirt and level a 10 to 12 acre area at site 13 in violation of paragraphs 1 and 2, which prohibit discharges without a

permit. The court reasoned that the scraping of materials from a wetland constitutes a discharge, because wetlands are defined by the presence of aquatic vegetation. *See* 33 C.F.R. § 323.2(a)(7)(c) (1983). Moreover, the regulations also provide that Section 1344(f)(1)'s exemption for plowing "does not include the redistribution of soil, rock, sand, or other surficial materials in a manner which changes any of area of the waters of the United States to dry land. For example, the redistribution of surface materials by blading, grading, or other means to fill in wetland areas is not plowing." 33 C.F.R. § 323.4(D) (1983). *See also Avoyelles Sportsmen's League v. Alexander,* 473 F.Supp. 525, 533 (W.D.La.1979), 715 F.2d 897 (5th Cir.1983). We find nothing erroneous in the court's conclusion, and affirm the court's ruling that the Huebners violated the 1978 order by not giving notice and applying for a permit for this scraping activity.

IV. DUE PROCESS

The Huebners argue on appeal that they were denied due process by the district court in that the court excluded evidence on the prior interpretation of Section 1344's agricultural exemption, on the meaning of the phrase "maximum drainage control" used in paragraph 7 of the 1978 order, on their estoppel and selective enforcement claims, and on assorted other matters. Because we find little merit in the Huebners' due process arguments, we treat these matters summarily here.

A potential contemnor in a civil contempt proceeding must be afforded a "meaningful opportunity to present a defense." *Commodity Futures Trading Comm'n v. Premex, Inc.,* 655 F.2d 779, 782 n. 2 (7th Cir.1981). In this case the Huebners received that opportunity when the district court afforded them six full days of a trial-type hearing on the contempt charge, at which the Huebners were represented by counsel, presented testimony and documentary evidence totaling over a hundred pages, and cross-examined the government's witnesses. Moreover, the record

indicates that the Huebners were permitted to introduce documents involving "official Corps policy as opposed to an interpretation merely by individual Corps officials," R. 108, at the remedy stage of the proceedings and that they, through their prior attorney, had agreed to these procedural ground rules prior to the hearing.

■■■ The court below also properly excluded evidence on the "intent and purpose" of the phrase "maximum drainage control." The scope of a consent decree must be interpreted within its four corners and not with reference to the specific "purposes" of the parties involved. *Commodity Futures*, 655 F.2d at 782. In the absence of genuine ambiguity of meaning, no evidence beyond the plain meaning of the terms themselves was required. We find nothing clearly erroneous in the district court's interpretation of "maximum drainage control" as meaning that the Huebners guaranteed the protection of the integrity of wetlands by agreeing not to drain off the water. *Cf. United States v. Greyhound Corporation*, 508 F.2d 529 (7th Cir. 1974) ("restore practices and traffic patterns" held not ambiguous). The district court therefore properly rejected the Huebners' contention that the phrase referred only to the seasonal moderation of the flow of water from the reservoirs by the raising and lowering of the dikes.

■■■ The Huebners' estoppel claim is supported neither by the facts, which indicate that they were permitted to present evidence on the estoppel claim at the hearings on the restoration plan, nor by their legal argument. The Supreme Court recently stated that "the Government may not be estopped on the same terms as any other litigant," reasoning that "those who deal with the Government are expected to know the law and may not rely on the conduct of government agents contrary to law." *Heckler v. Community Health Ser-*

*vices of Crawford County,* —— U.S. ——, 104 S.Ct. 2218, 2224, 2226, 81 L.Ed.2d 42 (1984). *See also Schweiker v. Hansen*, 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981). In *Heckler* the court held that before estoppel will apply against the government in its effort to enforce the law, the alleged estopping statements must be in writing and must be made by officials at a policy-making level. *Heckler*, 104 S.Ct. at 2227. *See also City of Alexandria v. United States*, 737 F.2d 1022, 1028 (Fed. Cir.1984).

The court below found that while there had been extensive correspondence between the defendants and the Corps, none of this correspondence contained misleading representations as to the permissibility of the Huebners' conduct which was found in violation of the consent decree. Furthermore, the court credited the affidavit of Corps personnel and found that although some oral statements may have been made indicating that certain activity did not require a permit, the Huebners continued to plow even after being subsequently informed that such plowing did require a permit. The record in this case clearly does not establish a case of estoppel against the government under the principles of *Heckler* and *Schweiker*.[11] We find nothing erroneous in the court's rejection of the Huebners' estoppel claim. *See also Deltona Corp. v. Alexander*, 682 F.2d 888 (11th Cir.1982).

## V. RESTORATION PLAN

■■■ A lower court's remedy for civil contempt is reviewable only under the limited "abuse of discretion" standard. *Sportmart, Inc. v. Wolverine World Wide, Inc.*, 601 F.2d 313 (7th Cir.1979). The court below exercised its discretion in ordering particular restoration activities to be performed by the Huebners after considering whether the plan: (1) is achievable as a practical matter; (2) confers maximum en-

---

**11.** While the record is clear that estoppel does not apply in this case, we take this opportunity to caution Corps personnel to be clear in their dealings with citizens pursuant to carrying out their duties under the Clean Water Act. The private owners of wetlands are rarely lawyers, and Corps personnel should therefore assist these citizens in complying with the law by being simple, direct and uncontradictory in their communications.

vironmental benefits; and (3) bears an equitable relationship to the degree and kind of wrong. R. 137, Order at 1. *See United States v. Sexton Cove Estates, Inc.*, 526 F.2d 1293, 1301 (5th Cir.1976). Upon review we find one portion of the district court's order to have been an abuse of discretion. The majority of the court's order, however, was within the court's discretion.

■ The district court's remedial order requiring the Huebners to maintain certain water levels and to conduct other restoration activities withstands our review under the abuse of discretion standard. The record presents sufficient evidence to support the practicability of the maintenance of specified water levels at the reservoirs and other locations. The district court relied heavily on assessments of the credibility of the experts who testified as to the practicability of the water level aspect of the plan, noting that the achievability of such levels was "not a matter of common sense." R. 137 at 4. We must accord great weight to lower courts' factual determinations when they depend on the assessment of a witness' credibility, *cf. NLRB v. Cutting, Inc.*, 701 F.2d 659, 663 (7th Cir. 1983), and thus we affirm that portion of the district court's order.

■ The Huebners complain bitterly about the ordered destruction of their permitless ten-acre expansion of the Staege cranberry beds, alleging that the beds are worth $400,000 and that their destruction is neither "cost-effective nor environmentally warranted." We agree with the Huebners and find the district court's order to destroy the ten acre bed to have been an abuse of discretion. The district court found that the Huebners' cranberry bed expansion "would not achieve maximum environmental benefits for the land at issue," and that, given the nature of the Huebners' repeated violations, the destruction of this bed bore an equitable relationship to the harm to the land caused by the Huebners.

Expert testimony in the record indicates however, that cranberry beds are compatible with wetlands, although they do not perform the same water filtration and storage functions as an undisturbed wetland. The district court also noted that the Huebners might have been able to expand the Staege bed had they applied for an expansion permit in the first instance. R. 137 at 8. Moreover, evidence in the record reveals that some representatives of the Corps were cognizant of the Huebners' expansion of the cranberry beds. While this Corps conduct was insufficient to meet the exacting requirements necessary for the government to be estopped from seeking a contempt citation against the Huebners, it should have been a factor to be given considerable weight by the trial court in fashioning a restoration order. Given this evidence, we think that it was an abuse of discretion for the district court to find that the destruction of the cranberry expansion bed bore an equitable relationship to the degree and kind of wrong committed by the Huebners. The Huebners did not follow the rules of the consent decree, admittedly, but it is a draconian exercise of judicial discretion to order undone a ten-acre expansion of cranberry beds which it took the Huebners several years to develop and which beds are not inherently incompatible with the surrounding wetlands. Therefore, we reverse the district court's remedial order and remand with instructions to strike that portion of the order decreeing the destruction of the ten-acre cranberry bed.

## V. CONCLUSION

It must be emphasized that any perceived severity in the findings and the remedy of the district court which we affirm in part and reverse in part here were brought on the Huebners by their own failure to comply to the terms of the 1978 consent order into which they had voluntarily entered. While the Huebners and amicus, the Wisconsin Cranberry Growers Association, voice concern over the ability of cranberry farming to continue in Wisconsin should we affirm the district court's orders, we decline to be persuaded by these highly speculative prophecies of doom. The Huebners may continue to farm their land.

The district court recognized in ordering the restoration plan that the Huebners may still plant corn on parts of their property. R. 137 at 3. The Huebners may continue to farm cranberries or other crops, as long as they comply with the terms of the 1978 order which requires notice and application for permits. Other cranberry farmers or owners of wetlands property are also not prohibited from making a productive use of their property; proper compliance with the permit process is all that is required under the Clean Water Act to ensure that the use of the nation's wetlands proceeds with care. In conclusion then, the district court's finding of contempt is affirmed and its remedial restoration order is reversed and remanded with instructions to the district court to strike that portion of the order ordering the destruction of the ten-acre cranberry bed.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.