# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 02-1863

GREENFIELD MILLS, INCORPORATED, JUDI MEDLOCK,
GENE LEWIS, et al.,

*Plaintiffs-Appellants,*

*v.*

LARRY MACKLIN, as Director of the Indiana
Department of Natural Resources,
GARY ARMSTRONG, NEIL LEDET, et al.,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 00 C 219—**William C. Lee**, *Judge.*

———————

ARGUED DECEMBER 9, 2002—DECIDED MARCH 19, 2004

———————

Before BAUER, RIPPLE and KANNE, *Circuit Judges.*

RIPPLE, *Circuit Judge.* After employees of the Indiana
Department of Natural Resources ("DNR") drained a
supply pond into the Fawn River, the plaintiffs, riparian
landowners, brought this action against DNR employees,
David Clary, Tom Meyer, Neil Ledet and Gary Armstrong,
in their individual capacities, and against the Director of the

DNR in his official capacity. The plaintiffs alleged that these defendants had violated the Clean Water Act ("CWA"), 33 U.S.C. § 1251 et seq., and also had violated their rights under the Takings and Due Process Clauses of the Constitution of the United States. The parties filed cross-motions for summary judgment. The district court granted the defendants' motion for summary judgment on all claims. For the reasons set forth in the following opinion, we reverse the judgment of the district court with respect to the CWA claim and remand for further proceedings. With respect to the takings and due process claims, we affirm the judgment of the district court.[1]

# I

# BACKGROUND

## A. Factual Background[2]

The plaintiffs are riparian landowners along a five-mile portion of the Fawn River that begins at Orland Dam and ends at Greenfield Millpond. The defendants are an official of the DNR and employees of the DNR who work at the Fawn River State Fish Hatchery ("Hatchery") located in

---

[1] After oral argument, the court invited the Environmental Protection Agency and the United States Army Corps of Engineers to file a brief as amicus curiae. The Agency and the Corps accepted the court's invitation and filed a brief. The court expresses its thanks to both for the assistance that they have rendered.

[2] Because the district court granted summary judgment to the defendants, we take the facts as alleged by the plaintiffs to be true. *See Adusumilli v. City of Chicago*, 164 F.3d 353, 357 (7th Cir. 1998).

Orland, Indiana. The Fawn River runs through the Hatchery property. As it flows near the Hatchery's main building, the river has been dammed to form a 1.75 acre supply pond. This supply pond feeds by gravity the Hatchery's fish rearing ponds. When the main flow control gates on the dam are opened, the pond water flows from the supply pond down the Fawn River and eventually to Greenfield Millpond.

A bypass channel upstream of the supply pond is used to divert the Fawn River before it reaches the supply pond. The Fawn River, as it existed below the supply pond prior to May 18, 1998, was a clean, clear body of water. The river had a gravel bed and was used for swimming, fishing, canoeing and other recreational activities. It also was home to various plant and aquatic animal habitats. *See* R.4, Ex.5.

In 1993, there was discussion in the Town of Orland regarding a "proposed dike . . . and mill pond dredging adjacent to the town park." R.4, Ex.12. "The project [was] being proposed to alleviate flooding of the Fawn River into the town park." *Id.* In a letter from a state senator to the Orland Town Board, the senator noted the problem with the supply pond and stated that "the Fawn River is a highly protected environmental river and it may be difficult to make any kind of repairs or dredging in that area." R.4, Ex.14. The DNR supported the project, stating in a June 18, 1993 letter that the supply pond had built up silt for more than 12 years, and, as a result, it was not navigable "even in a canoe." R.4, Ex.12. The DNR stated also that "[a]quatic vegetation ha[d] taken over the supply pond" and that the DNR would "submit[] a work plan this summer to control the vegetation using approved chemicals." *Id.* In that same letter, the DNR noted that "[s]uch a work plan will tie in

nicely with the town's project." *Id.*[3] In 1994 and 1995, the DNR applied chemicals, destroying much of the plant life in the supply pond. After having destroyed the vegetation, the DNR noted that the pond was "now navigable, by canoe, for the first time in over a decade." R.4, Ex.10.

In 1996, defendants David Clary, the Property Manager for the Hatchery, and Tom Meyer, the Assistant Property Manager for the Hatchery, noticed a problem with the main flow control structure of the dam. The flow control structure consisted of six separate gates. The gates were made of horizontal wooden slats that were stacked in two rows and slotted into four vertical metal I-beams. Some of the I-beams appeared to be rusting. On March 31, 1997, Mr. Clary consulted a local welder, who observed that repairs to the I-beams were needed. Mr. Clary sent a project proposal and budget for the repairs to Gary Armstrong, Hatcheries Supervisor, on April 16, 1997. This proposal specifically made reference to draining the supply pond in order to complete the repair, but stated that the repair "would have to be completed during a time of low water flow." R.93, Ex.21 at 2. Also, in the memo attached to this proposal, Mr. Clary asked: "Will we need to get a permit for the dam repair work?" *Id.* at 1. When Mr. Clary was asked during his deposition whether he ever had received an answer to this question, he replied: "I don't think we ever received an answer on that. . . . I have no documentation of an answer from [Gary Armstrong]." R.93, Ex.16 at 64. Funding approval for the repairs was obtained on October 23, 1997.

Later, on March 12, 1998, Mr. Clary discovered a problem with the river intake plumbing, specifically, the pump was

---

[3] The "town's project" was the proposed dredging of the supply pond and construction of the dike. *See* R.4, Ex.12.

not holding its prime. The pump is used to run water into the Hatchery and rearing ponds and is critical to Hatchery operations. After trying various small repairs, Mr. Clary and Mr. Meyer concluded that the plumbing in the river inlet structure needed to be exposed in order to make the plumbing repairs. The Hatchery needed the pump system to be working properly by June 1, 1998, for the Walleye harvesting.

On May 18, 1998, Mr. Meyer and Mr. Clary decided to draw-down the water in the supply pond to make the plumbing repairs, to allow visual inspection of the gates and to have a test draw-down for the future repairs that were to be done to the gates. Mr. Armstrong, their supervisor, was aware of the plans to open the dam and lower the supply pond. However, Mr. Clary stated in his deposition that initially they had not intended to drain fully the supply pond. Mr. Clary also said that they had not intended to "fully inspect the dam gates down to the bottom." R.93, Ex.16 at 23. In fact, Mr. Clary stated that, in determining how low to draw down the supply pond, their "intentions were only to expose the piping." *Id.* at 67.[4]

At approximately 8:30 a.m., Mr. Clary and Mr. Meyer began the draw-down process by raising the upper three gates of the main flow control structure. After waiting for

---

[4] The plaintiffs take issue with Mr. Meyer's and Mr. Clary's explanations that the purpose of opening the dam was to make repairs to the pump. The plaintiffs point to evidence in the record that, prior to the incident, the defendants were aware that it was possible to drain the supply pond more slowly to avoid the release of mud and sediment into the Fawn River. *See, e.g.*, R.93, Ex.1 at 197-99, 205 (deposition of Mr. Meyer) (conceding that "we probably could have done it [drained the supply pond] slower than we did").

several minutes, the water level in the supply pond stabilized, although there was still a considerable amount of water flowing over the top of the three lower gates.[5] Mr. Clary and Mr. Meyer then proceeded to open one of the three bottom gates. After several attempts and much difficulty because of the water rushing over the top of the gate, they succeeded in raising the gate a few inches. They then continued to raise the gate incrementally until the bottom of the gate was above the level of the water exiting the supply pond. By 11:00 a.m., the supply pond was drained to the point that the pipes and plumbing work were exposed and all that remained of the pond was a meandering channel of water cut into the floor of the supply pond flowing toward the open gates. Leaving the gates open, Mr. Clary and Mr. Meyer took a lunch break, made a visit to a rock dam upstream of the supply pond, traveled to the east unit of the hatchery to observe water levels, worked on a list of materials needed for the plumbing repairs and then traveled separately to purchase repair parts and plumbing supplies.

Mr. Meyer was first to return to the dam from his errand and was met at approximately 2:00 p.m. by defendant Mr. Ledet, a DNR Fisheries Biologist. Standing next to the open gate, Mr. Ledet noticed that "the water level in the supply pond had been lowered to a distinct channel exposing the silt-covered bottom. . . . Water flowing through this channel was picking up silt and transporting it through the flow control gate." R.80 ¶ 5. Mr. Meyer testified that Mr. Ledet remarked to him that the water flowing through the gate "looked awful damn muddy." R.93, Ex.1 at 200.

---

[5]  Mr. Meyer admitted that the water flow on the supply pond was not low on May 18, 1998; instead he recollected "a normal flow type of condition, neither high nor low." R.93, Ex.1 at 69.

The two men were standing next to the open gate discussing the project when plaintiff Gene Lewis arrived; he was visibly upset. Mr. Lewis pointed out that muck and sediment were being flushed out of the supply pond, through the open dam and into the river, and he requested that the gates to the dam immediately be closed. The men refused to comply with Mr. Lewis' request, and, shortly thereafter, Mr. Ledet returned to his office located on Hatchery property.

Larry Koza, a DNR assistant Fisheries Biologist, who also maintained an office on Hatchery property, stated in his deposition that "when I looked out and I saw the water, it was . . . black. It . . . apparently had a high silt load in it from eroding a channel into the bottom" of the supply pond. R.93, Ex.23 at 45. Concerned about the sediment being flushed into the river and the adverse effect it could have on the fish populations downstream, Koza and Mr. Ledet decided to drive together upstream to the water control structure of the bypass channel. Upon arrival, the men opened completely the partially open water control structure "to divert as much clean water into the river below the dam as possible, bypassing the hatchery [supply pond]." R.80 ¶ 7.[6]

---

[6] In his deposition, when asked why, upon seeing the black water flowing through the dam, he quickly attempted to increase the amount of clean water in the river, Larry Koza responded:

> Well, you hate to see a lot [of] heavy, you know, dark colored sediment laden, whatever you call it, water going down the stream. And if that has to happen, then you want to make sure that you have as much fresh water, you know, coming into there. My—you know, my first thought was for [the] fish population to make sure that you were getting as much clean water through as you could.

(continued...)

Meanwhile, around 2:15 p.m., Mr. Clary returned from his errand to the site of the dam. Simultaneously, Attorney Neal Lewis, son of Gene Lewis and counsel for the plaintiffs, arrived on the scene. Attorney Lewis demanded that the gate be shut immediately, but Mr. Meyer and Mr. Clary informed him that they were working on some repairs to the pump and would shut the gate as soon as the repairs were finished. However, after a short discussion concerning the day's events, Mr. Meyer and Mr. Clary decided to shut the gate without making the repairs. Around 3:00 p.m., Mr. Meyer informed Mr. Lewis that the bottom gate had just been lowered. Shortly thereafter the three top gates were also lowered. By 4:00 p.m., most of the supply pond had been refilled. *See* R.76 ¶ 12; *see also* R.77 ¶¶ 18-19.[7]

The record contains extensive evidence regarding the appearance and substance of the water that flowed through the bottom gate on May 18, 1998. Mr. Clary stated in his deposition that the water coming out of the bottom gate was "somewhat muddy," R.84, Ex.2 at 43; Mr. Meyer stated in his deposition that the water "was a muddy color immediately upon raising the bottom gate" and that "it was muddy throughout that draining operation, muddy col-

---

(...continued)
R.93, Ex.23 at 45.

[7] Whether the supply pond was refilled completely on the afternoon of May 18, 1998, seems to be in dispute. Dr. Daniel Willard personally inspected the supply pond on May 22, 1998, and he noted that the supply pond "showed that it had recently been drawn down considerably." R.9, Ex.2 at 20. Additionally, photographs taken on May 24, 1998, by plaintiffs Gene and Sharon Lewis show that water still was collecting in the channel cut on March 18, 1998, and that the upper supply pond had not refilled to its former banks. *See* R.84, Ex.10D.

ored," R.84, Ex.3 at 139; and Mr. Ledet stated in his deposition that the water coming through the dam "was very dark. It had picked up a lot of—or whatever a lot is—it had picked up, you know, bottom muck, sediment material," R.84, Ex.4 at 61.[8]

Similarly, the plaintiffs submitted extensive evidence detailing the effects of the released sediment on the Fawn

---

[8] The defendants themselves offered conflicting testimony concerning the water that came out of the gates and the effects on the river below. In contrast to the statements recounted in the text, the defendants made statements indicating that the water clarity was "unremarkable." *See*, *e.g.*, R.77 ¶¶ 19-20. Mr. Clary, for example, stated in his affidavit that, at about 5:00 p.m. on May 18, 1998, he traveled to the County Road 1100 East bridge that overlooked part of the river and from there the river appeared "normal and I could see the stream bottom." R.76 ¶ 13. Mr. Ledet made a similar statement that he went to the County Road 1100 East bridge and "[t]he water clarity and level at this bridge crossing were normal. The water was not unusually turbid or discolored with silt." R.80 ¶ 9. Additionally, Mr. Meyer noted that the water coming out of the bottom gate was "discolored"; and that after closing the gates he "observed a thin layer of silt and discolored water" downstream, but, from the County Road 1100 East bridge, "water clarity was unremarkable and [he] observed no dead or distressed fish." R.77 ¶¶ 19-20. The power of these statements is diminished by Mr. Clary's explanation in his deposition that, when he went to the bridge and saw "no indication [of] silt or sediment," that he knew that the silt or sediment cut from the dam "would have to have been" mostly discharged (at that time) somewhere *between* the County Road 1100 East bridge and the dam. *See* R.84, Ex.2 at 167. Mr. Clary's deposition statement makes it clear that he knew that the silt and deposit had to be somewhere above the County Road 1100 East bridge and below the dam. Thus, the fact that the river color and flow was unremarkable at County Road 1100 did not indicate to him that the river was free from silt or other deposits.

River. Gene Lewis testified that he personally witnessed mud flowing through the open dam. He stated:

> While the DNR was cutting out the bottom of their impoundment by having opened fully their dam structure, I entered the river immediately below the spillway structure of the DNR dam where I was standing in a semi-solid flow of mud which had the consistency of loose cooked oatmeal and looked like chocolate-brown pudding. I could feel this semi-solid flow of mud to approximately my knees—about 2 feet deep. On top of this flowing river of mud was a layer of very murky water in a liquid state.

R.84, Ex.10 at ¶ 8. Mr. Lewis also presented photographs of himself standing in the mud below the dam. Specifically the photographs show him holding up black mud that was flowing from his feet to his knees. *See* R.84, Ex.10A. Mr. Lewis also took photographs of sections of the supply pond after the channel had been cut through it; these photographs show the water flowing through the channel with the exposed black-mud floor on both sides. *See id.* He later had photographs taken of himself standing in and measuring the mud deposits in the Fawn River after the opening of the dam; these deposits ranged in depth from a few inches to two feet. *See* R.84, Ex.10C.

Plaintiffs also submitted expert testimony by professors at Indiana University who performed in-depth analyses of the river and the mud deposits therein after the dam had been opened. Dr. Michael Zaleha's study demonstrated that the sediment in the river above the dam is different from the mud that now exists in the river below it and that the physical and chemical characteristics of the mud deposits in the Fawn River are not typical of river muds; he also opined that these deposits were caused by a rapid flow of a water

and mud mixture (40%-80% concentrated) resulting from the opening of the dam. He further noted that he personally had observed "the large volume of mud deposits" which extend for several miles now on the Fawn River. R.84, Ex.7 at 15. John Gasper, a professional engineer, performed studies to determine the amount of mud deposited by the flow into the Fawn River. He concluded that "approximately one hundred thousand cubic yards of unconsolidated material were discharged and deposited into the lower reaches of the Fawn River"; this amount was generated from between 10,000 and 33,000 cubic yards of consolidated material that was dredged from the supply pond. R.84, Ex.8 ¶ 6. Gasper stated that, had the vegetation not been killed in 1994 and 1995, the amount of sediment cut out of the supply pond would have been significantly less. He also stated that these deposits

> have elevated the bottom of Fawn River, are impairing the flow and circulation of those waters and are reducing the pre-event reach of the waters. In addition, certain areas of the channel that were once flowing are currently stagnant and other areas of quiet waters have been significantly filled with mud.

R.84, Ex.8 ¶ 7.

Dr. Daniel Willard, a professor of environmental sciences, reached a similar conclusion after conducting a study on the effects of the draw-down that occurred on May 18, 1998. Dr. Willard stated:

> The volume of reservoir sediments released from [the supply pond] is estimated to have occupied a channel of 20 feet wide, 5,000 feet long and average 5 feet thick (8 feet near the dam and 2 feet 5,000 feet upstream from the dam). This represents a volume of 500,000 cubic feet of reservoir sediment.

R.84, Ex.9B at 14. Dr. Willard also stated:

> I have further observed the condition of the small lake
> at Greenfield Mills, Indiana prior to May 18, 1998, and it
> has under gone a substantial and extraordinary trans-
> formation since the events of May 18, 1998. What was
> once a mostly [] open water shallow lake environment
> is now an emergent wetland environment dominated by
> marshy conditions as a result of massive deposits of
> sedimentation from the events of May 18, 1998.

R.84, Ex.9 ¶ 12.[9] Dr. Willard's report also contains extensive
research into the adverse effects of the mud on the Fawn
River plant and animal life. Specifically, the report contains
his own eyewitness account of the fish kill that occurred as
a result of the release of mud into the river:

> At several points along the way large numbers of dead
> fishes were laid out on the bank. . . . These fishes
> included many species with notably large Northern and
> Walleye, plus Smallmouth, suckers, carp, and a variety
> of other fishes. Several of these fishes showed gills
> covered with muck on examination. I saw several,
> hundred, dead fishes total.

---

[9] Plaintiffs also placed into the record affidavits and photographs
regarding the substantial deposits of mud into Greenfield
Millpond. The affidavits demonstrate that the Greenfield
Millpond, which is located approximately five miles downstream
from the Orland Dam, was converted from a primarily open
water environment before May 18, 1998, to a primarily vegetative
environment after the dam was opened. *See* R.84, Ex.12 ¶4,
Exs.12A-12B.

*Id.* ¶ 21.[10] The defendants do not dispute with affidavits or other evidence any of the expert or lay testimony brought by the plaintiffs showing that massive amounts of sediment were deposited into the river or onto the plaintiffs' property.[11]

Mr. Meyer stated in his deposition that he and Mr. Clary made no repairs to the plumbing on May 18, 1998. He also stated that the repairs on the plumbing that had been planned for May 18, 1998, were actually accomplished a few weeks later. The actual repairs were accomplished without drawing-down, lowering or draining the supply pond. Mr. Clary noted that a DNR diver completed the plumbing

---

[10] This observation was corroborated by several other documents in the record. For example, Gene Lewis stated in an affidavit that he found ninety-four dead fish the day after the opening of the dam and has observed the death or disappearance of many fresh water mussels and snails. *See* R.84, Ex.10 ¶¶10, 23. Indeed, the DNR acknowledged the fish kill. *See* R.4, Ex.8.

[11] In fact, the defendants' own evidence supports the plaintiffs' theory that the water cut a channel through the floor and that the displaced sediment went into the Fawn River. Mr. Clary stated in his deposition that the water coming out of the dam became "somewhat muddy after the pond was drained and it was cutting the channel as it went through the pond bottom." R.84, Ex.2 at 43. He went on to explain that, although he "didn't make any measurements" he would guess that the "meandering" channel was "anywhere from one to three feet" deep. *Id.* at 44. Mr. Ledet, upon arrival at the supply pond, noticed that "the water level in the supply pond had been lowered to a distinct channel exposing the silt covered bottom. Water flowing through this channel was picking up silt and transporting it through the flow control gate." R.80 ¶5. Thus, according to the defendants' evidence, the force of the water flowing out of the dam cut a channel into the floor of the supply pond.

repair in less than three hours. *See* R.93, Ex.16 at 21. With respect to the repair to the dam gates, DNR Structural Engineer Larry Wayland suggested three different alternative repair scenarios, none of which required a rapid draining of the supply pond. Two alternatives involved using a coffer dam to retain the water in the pond while the repairs were being performed; these options did not require the supply pond to be drained at all. Indeed, the repair eventually was accomplished using such a device.

According to the defendants, the only repair work that Mr. Meyer and Mr. Clary accomplished on May 18, 1998, was attaching a chain to two of the lower gates. Mr. Meyer admitted, however, that this attachment was not really a "repair"; he explained that the action "was kind of an afterthought" taken as a result of the difficulty they experienced raising the three lower gates. R.93, Ex.1 at 221.

## B. District Court Proceedings

The plaintiffs brought this action against Mr. Clary, Mr. Meyer, Mr. Ledet and Mr. Armstrong, in their individual capacities, and against the Director of the DNR in his official capacity. They alleged that the defendants had violated § 402 and § 404 of the CWA, 33 U.S.C. §§ 1342 and 1344, respectively, by failing to obtain a permit prior to draining the supply pond. The plaintiffs also pursued two constitutional claims: They claimed that the deposit of mud on their property constituted an illegal taking by the State and that draining the supply pond without prior notice and hearing violated their due process rights. The defendants moved for summary judgment on all of these claims, and the plaintiffs filed a cross-motion for summary judgment on the § 404 claim.

The district court granted summary judgment to the defendants on all grounds and denied the plaintiffs' cross-

motion for summary judgment. Turning first to the § 404 claim, the district court determined that the hydraulic dredging or sluicing that occurred on May 18, 1998, came within the prohibition of dredging without a permit. However, it further determined that the dredging fell within the maintenance exception to the permit requirement set forth in 33 U.S.C. § 1344(f)(1)(b). In doing so, the court rejected the plaintiffs' argument that the defendants' actions could not constitute maintenance under the applicable regulation because, according to the regulation, "maintenance does not include any modification that changes the character, scope, or size of the original fill design . . . ." 33 C.F.R. § 323.4(a)(2). According to the district court, "original fill design" referred to the supply pond, and there was no evidence that the size or depth of the supply pond was altered by the draw-down.

The district court also determined that the defendants' actions did not fall within the "recapture" provision, 33 U.S.C. § 1344(f)(2). That section provides:

> Any discharge of dredged or fill material into the navigable waters incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced, shall be required to have a permit under this section.

33 U.S.C. § 1344(f)(2). The district court held that the purpose of the May 18, 1998 draw-down was to perform maintenance and not to " 'bring[] an area of the navigable waters into a use to which it was not previously subject.' " R.131 at 22-23 (quoting § 1344(f)(2)). Consequently, the defendants' actions were not "recaptured" by § 1344(f)(2), and a permit was not required.

With respect to the § 402 permit claim, the district court found that the sediments dredged from the supply pond

were pollutants under recent CWA case law. However, the court stated, the plaintiffs' § 402 claim failed nonetheless because "[a]ny 'churning' or movement of the soil or sediment in this case was entirely incidental to a maintenance activity that had no purpose of excavating and redepositing soil downstream." R.131 at 29.

The court then turned to the constitutional claims. With respect to the takings claim, the district court acknowledged that a physical invasion usually constitutes a taking. Nevertheless, the district court held that the plaintiffs' claim should be dismissed because the plaintiffs had not brought an action in state court for inverse condemnation and, therefore, had failed to exhaust their state remedies as required by *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985). With respect to the procedural due process claim, the district court held that the plaintiffs had failed to come forward with any evidence that the defendants had the requisite intent to deprive the plaintiffs of their property—a requirement of a due process violation. Alternatively, the district court stated that, "even if the acts alleged were intentional as Plaintiffs allege, this does not violate due process so long as adequate state post-deprivation remedies are available," and "Plaintiffs['] brief altogether fail[ed] to address why state post-deprivation remedies were inadequate nor d[id] they set forth any legal analysis on this point." R.131 at 36.

## II

## DISCUSSION

### A. Standard of Review

"We review the grant of summary judgment de novo." *Harley-Davidson Motor Co. v. PowerSports, Inc.*, 319 F.3d 973,

980 (7th Cir. 2003). Summary judgment is appropriate if, viewing the facts in the light most favorable to the non-moving party, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *See id.*

## B. The Clean Water Act Statutory Scheme

The CWA makes the "discharge of any pollutant" into navigable waters,[12] by any person[13] unlawful, absent compliance with specific provisions of the Act. *See* 33 U.S.C. §§ 1311(a), 1362(7), 1362(12). Two of those provisions are § 1342 (§ 402) and § 1344 (§ 404), which create permitting systems for the discharge of pollutants. Generally, in order to avoid liability under the CWA, a defendant who wishes to discharge a pollutant must first obtain a permit either under § 1344 (a § 404 permit) for the discharge of dredged or fill material or under § 1342 (a § 402 permit) for other pollutants. Because the plaintiffs allege that the defendants discharged dredged materials into the Fawn River, the question of whether a permit is required is answered by reference to § 404.[14]

---

[12] "Navigable waters," is defined as the "waters of the United States," 33 U.S.C. § 1362(7). The parties do not dispute that the Fawn River, an interstate river, falls within "waters of the United States." *See* Appellants' Br. at 21 n.14.

[13] "Person" is defined to include a "State, municipality, commission, or political subdivision of a state." 33 U.S.C. § 1362(5).

[14] The district court and the parties discussed CWA liability on the part of the defendants in terms of both § 402 and § 404. However, § 404 is the permitting scheme that regulates discharges of dredge and fill material, which is the category of dis-

(continued...)

(...continued)

charge at issue here, and thus is the permitting scheme relevant to this case. If a defendant falls within an exception to the permitting requirements of § 404 under § 1344(f)(1), as argued here, then the defendant is not liable under § 1311 for having "discharged a pollutant" or subject to the § 1342 (§ 402) permitting requirements. *See* 33 U.S.C. § 1344(f)(1) (explaining that the exemptions for obtaining a § 404 permit for the discharge of dredge and fill material also exempt the discharge from regulation under §§ 1311 or 1342). As explained in the amicus brief of the Environmental Protection Agency and the Army Corps of Engineers (collectively "amici"),

> [t]he discharge of pollutants other than dredged or fill material are generally regulated under section 402, which creates the EPA-administered National Pollutant Discharge Elimination System ["NPDES"] permitting program. *See* 33 U.S.C. § 1342. Discharges of dredged or fill material are generally regulated under section 404, which creates the Corps-administered dredge-and-fill permitting program. 33 U.S.C. § 1344.

> The discharges in this case fall within the purview of the section 404 program. . . .

Amicus Br. at 4-5. This distinction is also made clear in the regulations implementing § 1342. *See* 40 C.F.R. § 122.1(a)(1). ("The regulatory provisions contained in this part and parts 123, and 124 of this chapter implement the National Pollutant Discharge Elimination System (NPDES) Program under section 318, 402, and 405 of the Clean Water Act . . . ."). According to the regulations, "[t]he following discharges do not require NPDES permits: . . . (b) Discharges of dredged or fill material into waters of the United States which are regulated under section 404 of the CWA." 40 C.F.R. § 122.3(b).

We note in passing that the regulations implementing § 404 set forth certain exceptions to the definition of "discharge of

(continued...)

---

(...continued)

dredged material" including "[d]ischarges of pollutants into waters of the United States resulting from the onshore subsequent processing of dredged material that is extracted for any commercial use (other than fill)." 33 C.F.R. § 323.2(d)(3)(i). "These discharges," the regulations explain, "are subject to section 402 of the Clean Water Act even though the extraction and deposit of such material may require a permit from the Corps or applicable state Section 404 program." *Id.* However, such materials are not at issue in the present case, and § 404 is the only permitting process applicable here. Consequently, we affirm that portion of the district court's judgment holding that the defendants were not required to obtain a § 402 permit for their actions on May 18, 1998, but on the ground set forth above.

Nevertheless, we note our disagreement with the district court's conclusion that the defendants' purpose and intent were relevant in determining whether § 402 had been violated. *See* R.131 at 29 (stating that the defendants were not liable under § 402 because they "had no purpose of excavating and redepositing soil downstream"). Liability for discharging a pollutant without a § 402 permit and absent an exemption is strict; a defendant's intent or purpose is irrelevant. *See Kelly v. EPA*, 203 F.3d 519, 522 (7th Cir. 2000) (citing cases).

### 1. Section 404 Permit Requirement

The CWA generally prohibits "the discharge of any pollutant by any person" absent compliance with one of the permitting schemes set forth in the Act. 33 U.S.C. § 1311(a). The Act defines "discharge of pollutant[s]" to mean "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). Under the CWA, pollutant includes "dredged spoil, solid waste, . . . biological materials, . . . rock, sand . . . ." 33 U.S.C. § 1362(6). Here, the plaintiffs maintain that the DNR employees made an addition of "dredged spoil,"[15] namely the materials emptied from the supply pond, into the Fawn River from a point source, the Orland Dam.[16]

---

[15] In the district court, the parties disputed whether "dredged" materials included materials that had been hydraulically dredged or "sluiced"; however, the defendants do not urge any such distinction in this court.

[16] The CWA defines a point source as

> any discernable, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged.

33 U.S.C. § 1362(14). We noted in *Froebel v. Meyer*, 217 F.3d 928 (7th Cir. 2000), that several other circuits had addressed the issue whether a dam could be considered a point source and that "all have concluded that, at least under some circumstances, a dam can meet the statutory definition of point source." *Id.* at 937. Although we were not required to resolve the issue in *Froebel*

(continued...)

The defendants argue on appeal that there was no "addition" of dredged spoil to the Fawn River because the supply pond and the Fawn River constitute the same body of water. In support of their position, they point to *National Wildlife Federation v. Gorsuch*, 693 F.2d 156, 174-75 (D.C. Cir. 1982), and *National Wildlife Federation v. Consumers Power Co.*, 862 F.2d 580, 584 (6th Cir. 1988), which hold that the discharge of pollutants from one body of water to a contiguous one is not an "addition" because it does not *add* a pollutant from the outside world.

More recent cases, however, have undercut severely the holdings of *Gorsuch* and *Consumers Power*. For example, the Fourth Circuit in *United States v. Deaton*, 209 F.3d 331 (4th Cir. 2000), held that "sidecasting" (digging dirt from a ditch and casting it onto the contiguous wetland) was still an "addition" of a pollutant even though nothing was "added" from the outside world. The court stated:

> Once it was removed, that material became "dredged

---

(...continued)
(because the dam largely had been removed), we stated that "the CWA's definition of 'point source' . . . connotes the terminal end of an artificial system for moving water, waste, or other materials." *Id.* at 938. We also noted that "[t]he broad reach of 'navigable waters' pushes the natural reading of 'point source' back to the point at which an artificial mechanism introduces a pollutant." *Id.* Here, the artificial mechanism of the dam was used to convey pollutants into the Fawn River, a navigable waterway. Consequently, we believe that the dam constitutes a "point source." *See Catskill Mountains Chapter of Trout Unltd., Inc. v. City of New York*, 273 F.3d 481, 493 (2d Cir. 2001) (noting that "point source" refers to "the proximate source from which the pollutant is directly introduced to the destination water body," giving the example of a pipe).

spoil," a statutory pollutant and a type of material that up until then was not present on the Deaton property. It is of no consequence that what is now dredged spoil was previously present on the same property in the less threatening form of dirt and vegetation in an undisturbed state. What is important is that once that material was excavated from the wetland, its redeposit in that same wetland added a pollutant where none had been before.

*Id.* at 335; *see also Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 923-24 & n.43 (5th Cir. 1983) (noting that term "addition" may reasonably be understood to include "redeposit," that " 'dredged' material is by definition material that comes from the water itself," and that "[a] requirement that all pollutants must come from outside sources would effectively remove the dredge-and-fill provision from the statute"); *Borden Ranch P'ship v. United States Army Corps of Eng'rs*, 261 F.3d 810, 814 (9th Cir. 2001).

The rationale for limiting the holdings of *Gorsuch* and *Consumers Power* to the very circumscribed facts upon which they were based and to employ a broader definition of addition was well stated by the Second Circuit in *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481, 489-94 (2d Cir. 2001). The Second Circuit noted that the decisions of the courts in *Gorsuch* and *Consumers Power* were based on deference to the EPA's interpretation of "addition." The Second Circuit continued:

If the EPA's position had been adopted in a rulemaking or other formal proceeding, deference of the sort applied by the *Gorsuch* and *Consumers Power* courts might be appropriate. Instead, the EPA's position is based on a series of informal policy statements made and consistent litigation positions taken by the EPA over the years, primarily in the 1970s and 1980s. Recent Supreme Court

> cases emphasize that such agency statements do not deserve broad deference of the sort accorded by the *Gorsuch* and *Consumers Power* courts. *See United States v. Mead Corp.*, 533 U.S. 218 (2001); *Christensen v. Harris County*, 529 U.S. 576 (2000).

*Id.* at 490 (parallel citations omitted). The court then held that the narrow definition of addition simply could not be applied to the facts before it:

> The present case, however, strains past the breaking point the assumption of "sameness" made by the *Gorsuch* and *Consumers Power* courts. Here, water is artificially diverted from its natural course and travels several miles from the Reservoir through Sandaken Tunnel to Esopus Creek, a body of water utterly unrelated in any relevant sense to the Schoharie Reservoir and its watershed. . . . When the water and the suspended sediment therein passes from the Tunnel into the Creek, an "addition" of a "pollutant" from a "point source" has been made to a "navigable water," and terms of the statute are satisfied.

*Id.* at 492.

Unlike the position espoused by the EPA in *Gorsuch* and *Consumers Power*, here the EPA, participating at the court's invitation as an amicus curiae, has urged upon this court the broader definition of "addition" employed by the courts in the more recent § 404 cases. *See* Amicus Br. at 5 (stating that "the courts of appeals have consistently recognized that materials that have been scooped up and then redeposited in the same waterbody can result in a discharge of a pollutant" and citing, inter alia, *Avoyelles Sportsmen's League* and *Borden Ranch*). The EPA's position, which follows the holdings of recent circuit cases, is persuasive for several reasons. First, such a reading is compatible with the

purpose of the CWA to "restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Second, it is logical to believe that soil and vegetation removed from one part of a wetland or waterway and deposited in another could disturb the ecological balance of the affected areas—both the area from which the material was removed and the area on which the material was deposited. Finally, we agree with our colleagues on the Fifth Circuit that excluding such dredged materials from the concept of "addition" "would effectively remove the dredge-and-fill provision from the statute." *Avoyelles*, 715 F.2d at 924 n.43. We therefore follow the interpretation of the amici and of our sister circuits and hold that the discharge of dredged material, such as that removed from the supply pond, into a contiguous body of water or wetland, here the Fawn River, constitutes an "addition" of dredged spoil under the statute.[17]

The defendants' actions of May 18, 1998, therefore, constituted an addition of dredged spoil into the Fawn River and were subject to the permit requirement of § 404. In order to escape liability under the CWA, the defendants therefore must establish that their actions fall into one of the narrow exemptions to the permit requirements.

### 2. Maintenance Exception

---

[17] The amici note that the situation in *National Wildlife Federation v. Gorsuch*, 693 F.2d 156 (D.C. Cir. 1982), and *National Wildlife Federation v. Consumers Power Co.*, 862 F.2d 580 (6th Cir. 1988), concerned normal dam operations that resulted in changes to water quality. Here, by contrast, the sediment had settled out of the navigable waters, and the DNR's opening of the flow structure control gates dredged those materials from their resting place and added them to the navigable downstream waters.

Section 1344(f)(1) provides an exemption to the federal permit requirements "for narrowly defined activities specifically identified in paragraphs A-F that cause little or no adverse effects either individually or cumulatively." Envtl. Policy Div. of the Cong. Research Serv. for the Senate Comm. on Envtl. and Pub. Works, 95th Cong., 3 *A Legislative History of the Clean Water Act of 1977*, 420 (Comm. Print 1978) (hereinafter "*Legislative History*"). For these specified activities, a discharge of dredged or fill material "is not prohibited by or otherwise subject to regulation under this section or section 1311(a) or 1342 of this title [except 1317 of the CWA]." 33 U.S.C. § 1344(f)(1).

In order to be exempt from the § 404 permit requirement, however, a party must show not only that it is exempt under one of the provisions in § 1344(f)(1), it also must show that its activities do not fall within the "recapture" provision, § 1344(f)(2). "Read together the two parts of Section 404(f) provide a narrow exemption for . . . activities that have little or no adverse effect on the waters of the U.S." *United States v. Brace*, 41 F.3d 117, 124 (3d Cir. 1994). The defendants bear the burden of establishing both that they qualify for one of the exemptions of § 1344(f)(1) and that their actions are not recaptured by § 1344(f)(2).[18]

Turning first to the exemptions, the defendants maintain that their actions fall within the maintenance exemption set forth at § 1344(f)(1)(B). Paragraph (B) of § 1344(f)(1) exempts the discharge of dredged or fill material "for the purpose of maintenance, including emergency reconstruc-

---

[18] Amici construe the recapture provision as containing two distinct elements: that the activity (1) has " 'as its purpose bringing an area of the navigable waters into a use to which it was not previously subject,' and (2) has the consequence of impairing the flow or circulation of navigable waters or reducing the reach of such waters." Amicus Br. at 8.

tion of recently damaged parts, of currently serviceable structures such as dikes, dams, levees, groins, riprap, breakwaters, causeways, and bridge abutments or approaches, and transportation structures." 33 U.S.C. § 1344(f)(1)(B). The regulations provide that "[m]aintenance does not include any modification that changes the character, scope, or size of the original fill design." 33 C.F.R. § 323.4(a)(2). We have construed § 1344(f)(1) narrowly because "Congress intended that Section 1344(f)(1) exempt from the permit process only 'narrowly defined activities . . . that cause little or no adverse effects either individually or cumulatively [and which do not] convert more extensive areas of water into dry land or impede circulation or reduce the reach and size of the water body.' " *United States v. Huebner*, 752 F.2d 1235, 1240-41 (7th Cir. 1985) (quoting 3 *Legislative History* 420).

The plaintiffs contend that the defendants do not fall within the exemption under § 1344(f)(1) for the following reasons: (1) There is a genuine issue of material fact regarding whether the defendant's actual purpose in draining the supply pond was "maintenance" or merely a pretext for dredging the pond without a permit; (2) The exemption does not include dredging that was not reasonably necessary or at least proportional to the maintenance performed; and (3) The dredging of the pond was not maintenance because it impermissibly modified "the character, scope, or size of the original fill design." 33 C.F.R. § 323.4(a)(2). We consider each of these in turn.

### a. pretext

The plaintiffs first argue that the district court erred in granting summary judgment to the defendants because there is a genuine issue of material fact with respect to whether the defendants actually raised the gate to perform

maintenance on the dam or whether the "maintenance" was just a pretext to dredge the pond without a permit.

In determining the "purpose" of the defendants' actions, "reviewing courts have consistently looked beyond the stated or subjective intentions and determined the effect or 'objective' purpose of the activity conducted." *United States v. Sargent County Water Res.*, 876 F. Supp. 1090, 1101 (D.N.D. 1994) ("*Sargent County II*") (reviewing cases and noting that in those cases "[a]lthough each of the defendants stated a purpose facially worthy of an exemption, it was clear by their actions that the only 'purpose' each had was to circumvent the Act"). In *Sargent County II*, for example, the county's stated purpose was to remove accumulated silt from an existing ditch. In evaluating whether that stated purpose was the county's true purpose, the court observed: "Rather than approach the project haphazardly, it hired an engineer to determine the original depth, and it hired and directed a reputable contractor to perform clean-out maintenance work only. . . . The court has previously noted that *the stated purpose* [of maintenance] *was confirmed by the actions* of those who performed work on the drain." *Id.* (emphasis added). The court found that the defendants' activities of removing silt from a ditch fell within the § 1344(f)(1) exemption for "maintenance of drainage ditches," noting that the defendants' actions "were consistent with the stated intention of maintaining the drain." *Id.* at 1099.

Based on the record before us, we cannot reach the same conclusion with respect to the defendants' actions. The defendants were slow to repair, performed quite "haphazardly," and let the supply pond drain substantially farther (and for much longer) than was needed to do the repairs. By 11:00 a.m. on May 18, 1998, the supply pond was drained to a level where the pump was exposed and the lower gate was open such that the defendants could inspect the gate.

However, the defendants allowed the gate to remain open for four more hours; during this time, the defendants had lunch, purchased supplies and examined other areas of the hatchery. At the end of the day, the defendants had not repaired, or even attempted to repair, the pump. The defendants also have not brought forth evidence explaining the importance or necessity of a test draw-down to the subsequent repair of the gates. Finally, the plaintiffs submitted evidence that the DNR had expressed an interest in dredging the supply pond in the years prior to the draw-down and had been informed that obtaining a permit for this action would be difficult. Viewing the evidence in the light most favorable to the plaintiffs, and primarily noting the length of time during which the bottom gate was open and the pump was exposed without any attempt at making repairs, we hold that the plaintiffs have brought forth sufficient evidence to create a genuine issue of material fact with respect to the defendants' purpose in drawing down the water in the supply pond. On the basis of the record before us, a reasonable finder of fact could conclude that the purpose of drawing down the water in the supply pond was not to perform maintenance on either the pump or the dam, but rather was to dredge the supply pond without a permit.

### b.  necessity of dredging to maintenance

The plaintiffs argue that, in order for a dredging activity to fall within the maintenance exception, the dredging also must be reasonably necessary to the proposed maintenance. The EPA and the Army Corps of Engineers, as well, construe the maintenance exemption to carry a requirement of reasonable necessity. They state that the DNR's activities are exempt as maintenance *if* the "draw-down and discharge of sediment was necessary to perform those maintenance functions." Amicus Br. at 7. For the following reasons, we

believe that the amici's position—that the maintenance exemption carries with it a requirement that discharge of dredged material be reasonably necessary to the maintenance—is persuasive.

We note initially that a requirement of reasonable necessity or proportionality comports with the legislative history of the statute. Throughout the legislative history, Congress repeatedly stressed that the § 1344(f)(1) exemptions were intended to cover only a very narrow class of exemptions for activities "that cause little or no adverse effects either individually or cumulatively." 3 *Legislative History* 420.[19]

---

[19] *See also* 3 *Legislative History* 283 ("These specified activities should have no serious adverse impact on water quality if performed in a manner which will not impair the flow and circulation patterns and the chemical and biological characteristics of the affected waterbody and which will not reduce the reach of the affected waterbody." (H.R. Rep. No. 95-830, at 99 (1977)); *id.* at 421 ("A case-by-case permit review would not be required for narrowly defined activities that cause little or no adverse effects either individually or cumulatively, including those activities narrowly defined in 404(f)(1)(A-F)."); *id.* at 474 ("Federal permits will not be required for those narrowly defined activities that cause little or no adverse effects either individually or cumulatively" even though "it is understood that some of these activities may *necessarily* result in incidental filling and minor harm to aquatic resources . . . ." (emphasis added)); *id.* at 529 (noting that the § 1344(f)(1) exemptions "exclude[] from permit requirements, discharges of dredged or fill material in conjunction with the following activities that will cause little or no adverse effects either individually or cumulatively"); 4 *Legislative History* 870 (recognizing that the § 1344(f)(1) exemptions were intended "to free from the threat of regulation *those kinds of manmade activities which are sufficiently de minimus* as to merit general attention at State and local level and little or no attention at the national

(continued...)

Certainly there would be no guarantee against more than de minimus adverse effects on the environment if the discharge of dredged material was not required to be reasonably necessary or otherwise proportional to the maintenance performed.

Additionally, several courts have spoken of § 1344(f)(1) exemptions as containing a reasonableness requirement. In *Sargent County II*, 876 F. Supp. at 1098, the district court determined that the defendants' activities of removing silt from a ditch fell within the § 1344(f)(1) exemption for "maintenance of drainage ditches," particularly where "the individuals involved in the clean-out of Drain 11 were competent and *acted responsibly* in carrying out their assigned tasks." *Id.* (emphasis added). Additionally, in *United States v. Zanger*, 767 F. Supp. 1030, 1035 (N.D. Cal. 1991), the court found that defendants who graded, filled and changed the bottom elevation of a stream could not be exempt under the maintenance exemption because the exemption "is limited to 'maintenance' of certain 'structures,' " and there were no structures involved. The court further explained that "even if there had been [structures], defendants' filling goes *far beyond any reasonable definition of maintenance* or repair." *Id.* (emphasis added).[20]

---

(...continued)

level" (emphasis added)); *id.* at 912 (stating that the § 1344(f)(1) exemptions "should have only a minor impact on water quality if performed in a manner that will not impair the flow and circulation patterns and the chemical and biological characteristics of the affected waterbody, and that will not reduce the reach of the affected waterbody").

[20] The regulations also imply a requirement of reasonableness for the maintenance provision at least in the circumstance of
(continued...)

Accordingly, we agree with the plaintiffs and amici that, in light of the legislative history, existing case law and the rule that the § 1344(f)(1) exemptions must be narrowly construed, *see Huebner*, 752 F.2d at 1240-41, the maintenance exemption should be construed so that only dredging that is reasonably necessary to the proposed maintenance is exempt from the permit requirement.

Applying this standard to the case at hand, we believe that the plaintiffs have brought forth sufficient evidence to permit the trier of fact to conclude that the dredging of the pond was not reasonably necessary to either the maintenance of the pump or the alleged inspection of the gates. DNR engineers explained that the repairs could have been performed without a rapid draw-down, and in fact, both of the alleged repairs were later performed without any draw-down of the pond. Moreover, even if the repairs warranted a rapid draw-down and dredging of the pond, the pond was drained sufficiently to expose the plumbing by 11:00 a.m., and the bottom gate was fully open for inspection by the same time. However, the defendants kept the gates open, allowed the pond to continue "dredging" until 3:00 p.m. and never commenced the necessary repairs. Looking at the evidence in the light most favorable to the plaintiffs, we cannot say that the dredging of the pond—particularly from 11:00 a.m. to 3:00 p.m.—was, as a matter of law, reasonably necessary to the proposed maintenance.

---

(...continued)

emergency reconstruction of recently damaged parts. The regulations only exempt emergency reconstruction that "occur[s] within a reasonable period of time after damage occurs." 33 C.F.R. § 323.4(a)(2).

### c. character, scope, size of the original fill design

The regulations provide that "[m]aintenance does not include any modification that changes the character, scope, or size of the original fill design." 33 C.F.R. § 323.4(a)(2). The district court determined that the defendants' activities did not change the original fill design of the supply pond, and, therefore, the regulation was not implicated.

The district court, the parties and amici propose three alternative definitions of "original fill design." The plaintiffs argue that "original fill design" refers to the area where the dredged material is deposited, here the Fawn River. The defendants argue, and the district court held, that original fill design is comprised of the dam and the supply pond behind the dam. Amici argue that original fill design "refers to the manmade structures that are the subject of the exemption (e.g. dikes, dams, levees) rather than a natural watercourse such as the Fawn River." Amicus Br. at 8 n.7.

We are persuaded that the definition of "original fill design" suggested by the amici best comports with the language of the statutory exemption itself, which speaks to the maintenance of "structures." 33 U.S.C. § 1344(f)(1). The only "structure" involved in the proposed maintenance is the dam; neither the supply pond nor the Fawn River is a man-made "structure" similar to those listed in the statute.

Our decision to adopt the amici's position is consistent with *United States v. Sargent County*, 876 F. Supp. 1081, 1087 (D.N.D. 1992) ("*Sargent County I*"), one of the only decisions to address the issue. *Sargent County I* concerned the application of an analogous maintenance exemption for drainage ditches, § 1344(f)(1)(C). In that case, the court defined original fill design as "1) the *depth* and width of the ditch as it was originally constructed, plus 2) any improvements made to any segments of the ditch prior to the CWA's

jurisdiction over wetlands in 1975." *Id.* (emphasis added). The drainage ditch in *Sargent County* was man-made, constructed in 1917, and cut through three sloughs before draining into a river. *See Sargent County II*, 876 F. Supp. at 1092. In holding that maintenance could not include deepening or widening the ditch, the court in *Sargent County I* looked only for changes in the man-made ditch; the court did not examine whether the activities deepened or widened the sloughs or river or other natural watercourses affected by the drainage ditch. Therefore, because it follows the statutory language and comports with existing case law, we find persuasive the position of the amici with respect to the definition of "fill design."[21]

Applying this definition to the facts before us, we must conclude that, in drawing down the supply pond, the DNR employees did not "change[] the character, scope, or size of the original fill design" in violation of 33 C.F.R. § 323.4(2). There is no evidence to suggest that the draw-down affected the character, scope or size of the dam—the only man-made "structure" at issue.

We note that this holding does not compel the conclusion that the DNR activities constituted maintenance. As we have discussed previously, the plaintiffs have brought forth sufficient evidence to create a genuine issue of material fact as to pretext and as to the reasonable necessity of the dredging to the alleged maintenance.

### 3. The Recapture Provision

---

[21] We also note that "an agency's considered interpretation of its own regulation is entitled to deference 'when the language of the regulation is ambiguous.' " *Old Ben Coal Co. v. Dir., Office of Workers' Comp. Programs*, 292 F.3d 533, 542 n.8 (7th Cir. 2002).

As we noted earlier, in order to escape the permit re-quirements of § 1344, in addition to establishing that their actions fall within one of the exemptions of § 1344(f)(1), the defendants also must establish that their actions are not "recaptured" by § 1344(f)(2). The recapture provision pro-vides that, regardless of § 1344(f)(1),

> [a]ny discharge of dredged or fill material into the navigable waters incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced, shall be required to have a permit under this section.

33 U.S.C. § 1344(f)(2).

### a. statutory construction

Our interpretation of § 1344(f)(2) must be guided by well-established principles of statutory interpretation:

> When we interpret a statute, we look first to its lan-guage. If that language is plain, our only function is " 'to enforce it according to its terms.' " *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917)). The plain meaning of a statute is conclusive unless " 'literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.' " *Ron Pair*, 489 U.S. at 242 (quoting *Griffin v. Oceanic Contractors*, 458 U.S. 564, 571 (1982)). Therefore, our interpretation is guided not just by a single sentence or sentence fragment, but by the language of the whole law, and its object and policy. Further, we may adopt a restricted rather than a literal meaning of a word where

> acceptance of the literal meaning would lead to absurd results.

*United States v. Balint*, 201 F.3d 928, 932 (7th Cir. 2000) (citations and parallel citations omitted).

Here our analysis is straightforward. Looking to the language of § 1344(f)(2), the discharge of dredge or fill materials into navigable waterways is "recaptured" and subject to the permitting requirement when two conditions are met: 1) the discharge is "incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject"; *and* 2) "the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced" by the discharge. These two requirements are not set forth in the alternative but in the conjunctive; consequently, the recapture provision is applicable only when both of these conditions are present. The courts that have considered the recapture provision similarly have concluded that it applies only when *both* conditions have been fulfilled.[22] The case law's interpreta

---

[22] *See Borden Ranch P'ship v. United States Army Corps of Eng'rs*, 261 F.3d 810, 815 (9th Cir. 2001) (reciting language of § 1344(f)(2) and stating that "[c]onverting ranch land to orchards and vineyards is clearly bringing the land 'into a use to which it was not previously subject,' *and* there is a clear basis in this record to conclude that the destruction of the soil layer at issue here constitutes an impairment of the flow of nearby navigable waters" (emphasis added)), *aff'd*, 537 U.S. 99 (2002); *United States v. Brace*, 41 F.3d 117, 129 (3d Cir. 1994) (holding that district court incorrectly placed the burden of proof on the Government to establish "the two elements" of the recapture provision); *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 926 (5th Cir. 1983) (finding that the district court was correct in looking at the

(continued...)

tion of the statutory language is in accord with the interpretation offered by the amici, the agencies charged by Congress with the administration of the statute.[23] We note, moreover, that this interpretation is consistent with past constructions of the recapture provision proffered by the amici.[24]

---

(...continued)

"purpose and effect" of the activities); *Sargent County II*, 876 F. Supp. at 1102-03 (noting that the recapture provision applies where an activity "brings an area of navigable waters into a use to which it was not previously subject *and* where the flow of the waters is impaired and their reach reduced" (emphasis added)); *In re Carsten*, 211 B.R. 719, 732 (D. Mont. 1997) (stating that "[t]he plain language of 33 U.S.C. 1344(f)(2) entails two clauses" thus "creat[ing] a two prong test").

[23] *See* Amicus Br. at 8 (stating that § 1334(f)(2) recaptures an "otherwise exempt" activity "only if that activity (a) has 'as its purpose bringing an area of the navigable waters into a use to which it was not previously subject,' and (b) has the consequence of impairing the flow or circulation of navigable waters or reducing the reach of such waters").

[24] In a Regulatory Guidance Letter from the EPA and the Army Corps of Engineers concerning whether "Deep-Ripping" activities were recaptured under § 1344(f)(2), the recapture provision was construed as requiring a permit "for those otherwise exempt discharges which: a. convert an area of the waters of the U.S. to a new use, and b. impair the flow or circulation of the waters of the U.S. or reduce the reach of waters of the U.S." Regulatory Guidance Ltr. 96-02 (Dec. 12, 1996), *available at* http://www.usace.army.mil/inet/functions/cw/cecwo/reg/rgls/rgl 96-02.htm (expired Dec. 31, 2001) (underlining in original). Similarly, in a published memo from the EPA and Army Corps of Engineers, the recapture provision was construed as containing "a two part test" that requires recapture when both of the

(continued...)

In sum, the plain language of the statute establishes that the recapture provision requires a two-part showing: 1) that the dredging activity had as its purpose "bringing an area of the navigable waters into a use to which it was not previously subject," and 2) that the dredging activity caused the flow or circulation of navigable waters to be impaired or the reach of such waters to be reduced. This interpretation is bolstered both by case law and by the considered judgment of the interpreting agencies. Consequently, if the defendants can establish as a matter of law either that their purpose was not to "bring[] any areas of navigable waters into a use to which it was not previously subject" or that the activity did not impair the flow or reduce the reach of navigable waters, their actions are not "recaptured" by § 1344(f)(2).[25]

---

(...continued)

following are met: "1) does the activity represent a 'new use' of the wetland, and 2) would the activity result in a 'reduction in reach/impairment of flow or circulation' of waters of the United States?" United States Environmental Protection Agency & United States Dep't of the Army, *Memorandum: Clean Water Act Section 404 Regulatory Program and Agricultural Activities* (May 3, 1990), *available at* http://www.epa.gov/owow/wetlands/cwaag.html.

[25] We do not believe that a two-pronged approach runs contrary to our holding in *United States v. Huebner*, 752 F.2d 1235 (7th Cir. 1985). In that case, the plaintiffs had plowed and removed wetland vegetation from three reservoirs for "the immediate planting of barley [and] for the future planting of corn and other dryland crops," had "used backhoes to clean and deepen existing ditches," had "used a dragline to excavate an approximately 400 foot long new ditch," had drained wetlands, had "sidecast materials onto the wetlands," had "used bulldozers to spread the

(continued...)

**b. application**

---

(...continued)
discharge over several acres," had built roads, and had expanded the existing cranberry beds. *Id.* at 1241-43. It was clear that the plaintiffs' overall intention was to convert wetlands into uplands for the cultivation of dryland crops and to expand their existing cranberry beds into wetlands that previously had not been used for cultivating wetland crops. The plaintiffs in *Huebner* attempted to use the § 1344(f)(1)(C) exemption for the "construction or maintenance of . . . irrigation ditches" to exempt their ditching and draining activities. Although we did not specifically restate the requirement of § 1344(f)(2) of a "purpose [to] bring[] an area of the navigable waters into a use to which it was not previously subject," it was clear that the purpose of the activities described in *Huebner* was to bring wetlands into a new use. Thus the "new use" requirement was not at issue; all we needed to analyze was whether or not the second requirement of impairing the flow or circulation had been met. Thus the fact that in *Huebner* we only discussed the second requirement of the recapture provision does not indicate that the first requirement does not exist. As another court has noted, in *Huebner*, we "did not address the previous use issue with respect to the ditches because the project as a whole clearly went far beyond any prior use, as the . . . facts [in *Huebner*] amply demonstrate." *United States v. Stearns*, CIV. No. 3-89-0616, 1990 WL 606673 at *3 (D. Minn. 1990). Even more importantly, however, "[t]o cite *Huebner* for the proposition that any discharge of dredged material onto a wetland requires a permit under the recapture clause is to read the previous use language out of the recapture clause." *Id.* We agree that to read *Huebner* as requiring only a showing of a resulting impairment in the flow or reduction of the circulation of waters would read the language requiring a showing of a "purpose [of] bringing an area of the navigable waters into a use to which it was not previously subject" out of the recapture provision. 33 U.S.C. § 1344(f)(2).

We now must examine whether the defendants have established that the recapture provision does not apply to their actions of May 18, 1998.

We look first to whether the facts, construed in the light most favorable to the plaintiffs, establish that the defendants' purpose was other than "bringing an area of navigable waters" into a new use. Nevertheless, as we have just determined, the recapture provision has two components and showing merely effects will not serve as a substitute for a finding of a purpose to bring about a new use.

Although "[c]ommon sense dictates that, under normal conditions, ordinary maintenance would not subject an area to 'a use to which it was not previously subject,' " *Sargent County I*, 876 F. Supp. at 1088 (quoting 33 U.S.C. § 1344(f)(2)), many of the defendants' actions were inconsistent with their stated purpose of performing maintenance. After they drew down the water to expose the pipes and the dam, they did not engage in the proposed repairs immediately, but took a lunch break, drove to purchase supplies, and, indeed, never accomplished the proposed repairs on that day. Furthermore, there was evidence in the record that, prior to May 18, 1998, the defendants had expressed interest in dredging the supply pond. Given these facts, we do not believe that the defendants have established that their purpose was maintenance. Based on this evidence, a reasonable finder of fact could conclude that the defendants' maintenance explanation was merely a pretext. Thus, we cannot say that, as a matter of law, the defendants have established that they escape the first prong of the recapture provision.

With respect to the "effects" prong of the recapture analysis, viewing the evidence in the light most favorable to the plaintiffs, the record before us would permit the trier of fact to conclude that the defendants' actions of May 18, 1998,

impaired the flow and circulation of the Fawn River. The plaintiffs' evidence, set forth in some detail above, showed that the river bottom of the Fawn River had been elevated by 100,000 cubic yards of unconsolidated sediment that had been deposited in the river, thus altering the flow of the river. Specifically, one of the plaintiffs' studies showed that release of mud and silt into the Fawn River on May 18, 1998, "elevated the bottom of Fawn River, . . . impair[ed] the flow and circulation of those waters and . . . reduc[ed] the pre-event reach of the waters. In addition, certain areas of the channel that were once flowing are currently stagnant and other areas of quiet waters have been significantly filled with mud." R.84, Ex.8 ¶ 7. As well, the sediment traveled into Greenfield Millpond and transformed that area from a shallow lake to a marshland. Dr. Willard observed that "[w]hat was once a mostly . . . open water shallow lake environment is now an emergent wetland environment dominated by marshy conditions as a result of massive deposits of sedimentation from the events of May 18, 1998." R.84, Ex.9 ¶ 12. Given the evidence in the record to show that the deposit of dredged materials into the Fawn River altered the flow of that navigable waterway, the defendants' actions also permit the conclusion that the requirements of the second prong of the recapture provision have been met.[26]

---

[26] Several courts have recognized the importance of examining the effects of the activity in determining the defendants' "purpose." *See United States v. County of Stearns*, 1990 WL 606673, at *4 (D. Minn. Oct. 2, 1990) (stating that "the effect of the project must be considered where a[n] [] entity's 'purpose' is analyzed" and that "the 'purpose' question is closely related to the extent of wetlands likely to be lost"); *United States v. Akers*, 785 F.2d 814, 822 (9th Cir. 1986) ("It is thus the substantiality of the impact on

(continued...)

We therefore conclude that, viewing the facts in the light most favorable to the plaintiffs, a trier of fact could conclude reasonably that the defendants' actions in draining the supply pond on March 18, 1998, fall within the recapture provision and are subject to the § 404 permit requirement.


## C. Takings Claim

The district court noted that, under *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982):

> When faced with a constitutional challenge to a permanent physical occupation of real property, this Court has invariably found a taking. As early as 1872, in *Pumpelly v. Green Bay Co.*, 13 Wall. (80 U.S.) 166, 20 L. Ed. 557, this Court held . . . . that "where real estate is actually invaded by superinduced additions of water, earth, sand, or other material, or by having any artificial structure placed on it, so as to effectually destroy or impair its usefulness, it is a taking, within the meaning of the Constitution." *Id.*, 13 Wall. (80 U.S.) at 181.

*Id.* at 427; *see* R.131 at 30. Nevertheless, the district court (without discussing the issue of permanence)[27] held that the

---

(...continued)
the wetland that must be considered in evaluating the reach of § (f)(2)."); *United States v. Cumberland Farms*, 647 F. Supp. 1166, 1176 (D. Mass. 1986) (same). Although not essential to our holding today, we believe that a trier of fact would be entitled to consider and to give some weight to the effect of the defendants' actions in determining the purpose of their activity.

[27] The plaintiffs brought forth expert testimony that the deposits were at least semi-permanent, but no actual finding on this point

(continued...)

plaintiffs' taking claim was barred because the plaintiffs had failed to first bring an inverse condemnation suit in Indiana state court. *See* R.131 at 32.

In *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186-87 (1985), the Supreme Court "articulated a special ripeness doctrine for constitutional property rights claims." *Forseth v. Vill. of Sussex*, 199 F.3d 363, 368, 372 (7th Cir. 2000). Under *Williamson County*, federal courts are barred from adjudicating takings claims until the plaintiff has satisfied two requirements, namely, "(1) the 'Final Decision Requirement': the plaintiff must demonstrate that he or she received a 'final decision' from the relevant government entity"; and "(2) the 'Exhaustion Requirement': the plaintiff must have sought 'compensation through the procedures the States has provided for doing so.' " *Forseth*, 199 F.3d at 372 (quoting *Williamson County*, 473 U.S. at 186-87, 194). We have subject matter jurisdiction over only those takings claims for which the *Williamson County* requirements are satisfied or otherwise excused. *See Forseth*, 199 F.3d at 368.

Takings involving physical invasions—such as the taking alleged here—are subject to a more streamlined inquiry. We have held that a physical invasion constitutes a "final decision" and thus satisfies *Williamson County*'s first requirement. Therefore, this type of "takings claim is subject only to *Williamson*'s exhaustion requirement." *Forseth*, 199 F.3d at 372 n.12; *see also Wisconsin Cent. Ltd. v. Pub. Serv.*

---

(...continued)

was made. *See* R.84, Ex.9 ¶ 14 (noting that clearing of the deposits by the river itself will take decades if it ever occurs). Because we agree with the district court that the plaintiffs' takings claim is barred by the plaintiffs' failure to exhaust state remedies, we do not reach the question of permanence.

*Comm'n of Wisconsin*, 95 F.3d 1359, 1368 (7th Cir. 1996) ("In takings cases involving a physical invasion . . ., the plaintiff must exhaust available state judicial remedies for just compensation as a prerequisite to a lawsuit in an article III court.").[28]

In *Williamson County*, the Supreme Court also "adopted a limited exception to its exhaustion requirement based on the futility of seeking state court relief." *Daniels v. Area Plan Comm'n of Allen County*, 306 F.3d 445, 456 (7th Cir. 2002). We explained: "Specifically, the Court held that a plaintiff may be excused from the exhaustion requirement if he demonstrates that 'the inverse condemnation procedure is unavailable or inadequate.' If inverse condemnation is inadequate, i.e., where compensation for diminished value is not an issue, resorting to that remedy would be futile." *Id.* (quoting *Williamson County*, 473 U.S. at 197).

---

[28] *See also Pascoag Reservoir & Dam, LLC v. Rhode Island*, 337 F.3d 87, 91 (1st Cir.) (stating that "a modified version" of the *Williamson County* analysis "applies to physical taking cases," under which "the final decision requirement is relieved or assumed," yet "the state action requirement remains in physical taking cases: Compensation must first be sought from the state if adequate procedures are available" (internal quotation marks, brackets and citations omitted)), *cert. denied*, 124 S. Ct. 962 (2003); *Daniel v. County of Santa Barbara*, 288 F.3d 375, 382 (9th Cir.) ("The ripeness analysis of *Williamson County* applies to physical takings, but in a modified form. The first *Williamson County* requirement is automatically satisfied at the time of the physical taking . . . . The second *Williamson County* requirement remains the same. In a physical takings case, as in a regulatory takings case, the property owner must have sought compensation for the alleged taking through available state procedures."), *cert. denied*, 537 U.S. 973 (2002).

The plaintiffs argue that they do not have a remedy in state court and should be excused from the exhaustion requirement. Specifically, the plaintiffs point to recent Indiana case law which states that "an action for inverse condemnation is premature until such time as the land-owner can establish that there are not available avenues by which the landowner can put his property to an economically beneficial or productive use." *Galbraith v. Planning Dep't of Anderson*, 627 N.E.2d 850, 854 (Ind. Ct. App. 1994); *see also Mendenhall v. City of Indianapolis*, 717 N.E.2d 1218, 1227-28 (Ind. Ct. App. 1999). Because the plaintiffs still have some "economically beneficial or productive use" of their property, they maintain that they have no remedy under state law and that their position is akin to the plaintiffs in *Daniels*, for whom we excused the exhaustion requirement. We cannot accept this submission.

In *Daniels*, 306 F.3d at 456, the plaintiffs were seeking only injunctive relief. However, Indiana law was clear that "equitable relief is generally unavailable as a matter of law where an action for compensation can be brought subsequent to the taking." *Indiana Dep't of Transp. v. S. Bells, Inc.*, 723 N.E.2d 432, 434 (Ind. Ct. App. 2000). Furthermore, the Indiana courts explicitly had held that the State did not recognize equitable relief for the alleged taking that occurred in *Daniels*, and the plaintiffs in *Daniels* had not suffered any compensable injury.[29] Thus, in *Daniels*, we held that "with

---

[29] Here, it appears from the plaintiffs' complaint that they seek primarily damages, but also a "permanent injunction" against the defendants that would "prohibit[] any future lowering of the reservoir/freshwater lake waters without prior notice and adequate process to protect the Plaintiffs and the river from harm." R.1 at 25-26. Whether or not this injunction would be

(continued...)

no monetary loss and injunctive relief not an available option under [Indiana law], the inverse condemnation procedure is inadequate to address the [plaintiffs'] injury," and, consequently, "this futility exempts them from the exhaustion requirement." *Daniels*, 306 F.3d at 457.

However, Indiana courts have not constructed an absolute bar to state actions for physical-invasion takings such as that alleged in the present case. In spite of the all-encompassing statements made in *Mendenhall* and *Galbraith*, other Indiana cases indicate that Indiana in fact does recognize an inverse condemnation claim for a physical invasion of property, no matter how small that invasion. A brief overview of Indiana inverse condemnation law is instructive.

Under Indiana state law, there are two stages in any action for inverse condemnation. First, "the landowner must show that he has an interest in land which has been taken

---

(...continued)

warranted as a matter of law, the plaintiffs' complaint does not tie specifically the prayer for injunctive relief to the takings claim. *See id.* The plaintiffs pray primarily for damages. *See id.* Thus this case is not like *Daniels v. Area Plan Commission of Allen County*, 306 F.3d 445 (7th Cir. 2002), where the plaintiffs sought exclusively equitable relief and had suffered no compensable damages. Moreover, in their submissions to this court, the plaintiffs have argued only that they were not required to exhaust state remedies because Indiana allegedly does not recognize physical invasion takings. They did not argue that they were seeking injunctive relief and thus had no remedy under Indiana law. Thus we analyze the plaintiffs' takings claim as one for damages, and conclude that Indiana provides monetary relief for takings in the form of a suit for inverse condemnation. *See Daniels*, 306 F.3d at 456 (noting that Indiana provides an inverse condemnation action "to recover the value of the property which has been taken in fact" (internal quotation marks and citations omitted)).

for a public use without having been appropriated under eminent domain laws."[30] If the state "court finds that a taking has occurred, then the matter proceeds to the second stage where the court appoints appraisers and damages are assessed." *Jenkins v. Bd. of County Comm'rs of Madison County*, 698 N.E.2d 1268, 1270 (Ind. Ct. App. 1998).

In determining the first step, the Supreme Court of Indiana and Indiana appellate courts have recognized

> that there are "two discrete categories of regulations that violate the Takings Clause regardless of the legit-imate state interest advanced." The first category en-compasses regulations that require the property owner to suffer a physical "invasion" of his or her property. The second category encompasses regulations that deny all economically beneficial or productive use of land.

---

[30] The defendants appear to argue in their brief that the plaintiffs do not have any property rights in the Fawn River or its banks except a right to unimpeded river access and constructions of wharves, etc. *See* Appellees' Br. at 19. As noted by the plaintiffs, the district court ruled when denying a prior motion to dismiss that the plaintiffs had a property interest in the riverbed and use of the river under state law. The district court held that for state-law purposes, the Fawn River was non-navigable, and thus under Indiana law, the plaintiffs had the right to " 'free and unmolested use and control of [their] portion of the [river] bed and water thereon for boating and fishing.' " R.51 at 19 (quoting *Carnahan v. Moriah Property Owners Ass'n Inc.*, 716 N.E.2d 437, 441 (Ind. 1999)).

Because we determine that plaintiffs were required to exhaust their remedies in state court, we do not have jurisdiction to determine whether or not a taking took place and thus we will not delve into the issue of what property rights were or were not held by the plaintiffs under Indiana state law.

*Georgetown v. Sewell*, 786 N.E.2d 1132, 1139 (Ind. Ct. App. 2003) (quoting *Bd. of Zoning Appeals, Bloomington v. Leisz*, 702 N.E.2d 1026, 1028-29 (Ind. 1998)); *see also Metro. Dev. Comm'n of Marion County v. Schroeder*, 727 N.E.2d 742, 753 (Ind. Ct. App. 2000) (noting the existence of "two discrete categories" of takings regardless of legitimate state interests, namely takings by physical invasion and takings by denial of all economic use of the property); *Natural Res. Comm'n of Indiana v. Amax Coal Co.*, 638 N.E.2d 418, 430 (Ind. 1994) (noting that a "taking is recognized *not only for physical* seizure or *invasion of property by the government*," but also when a property owner is deprived of the "economically viable use of his property" (emphasis added)). This recognition of two categories of takings for purposes of inverse condemnation proceedings, *see Georgetown*, 786 N.E.2d at 1139, comports with the takings doctrine espoused by the Supreme Court of the United States.[31]

Furthermore, Indiana law also mirrors federal constitutional law in that a physical invasion need not deprive an owner of all economically beneficial use of the land in order to be compensable; rather, the Supreme Court of Indiana has stated that a taking occurs whenever the state "compel[s] a property owner to suffer a physical invasion,

---

[31] In *Palazzolo v. Rhode Island*, 533 U.S. 606 (2001), the Supreme Court recognized that "even a minimal permanent physical occupation of real property requires compensation under the Clause" and that "with certain qualifications . . . a regulation which denies all economically beneficial or productive use of land will require compensation under the Takings Clause." *Id.* at 617 (internal quotation marks and citations omitted). The Supreme Court of Indiana has noted generally that the property takings protections provided by the Indiana Constitution are coextensive with those provided by the Federal Constitution. *See Cheatham v. Pohle*, 789 N.E.2d 467, 472-73 (Ind. 2003).

*no matter how minute*, of his property." *Leisz*, 702 N.E.2d at 1028-29 (emphasis added); *see Loretto*, 458 U.S. at 427. Thus, Indiana recognizes a physical invasion taking claim, even for a minute physical invasion of a plaintiff's property.

In light of the distinction that Indiana law recognizes between takings characterized by a physical invasion and those that are not, we do not believe that the plaintiffs' arguments based on *Mendenhall* and *Galbraith* are compelling. As noted above, plaintiffs cite those cases for the proposition that a plaintiff may not pursue a state inverse condemnation action absent a showing that he has been deprived of all economically beneficial use of his property; however, neither case concerned a valid claim of a physical invasion taking.[32] As just reviewed, recent Indiana cases, including

---

[32] In *Mendenhall v. City of Indianapolis*, 717 N.E.2d 1218 (Ind. Ct. App. 1999), the state twice had seized the plaintiff's property and later had allowed him use of it if he signed a covenant that the property would not be used for "any adult use in the future." *Id.* at 1228. However, the court did not consider whether the physical seizures constituted takings because the plaintiff had failed to challenge the seizures in a timely manner in state court. *Id.* ("Mendenhall passed up his opportunity to argue the validity of the order and the subsequent seizure of his property."). The plaintiff also had argued that the restrictive covenant was a taking; with respect to this argument, the court stated that "Mendenhall has not shown that the covenant deprived his property of 'all economically beneficial or productive use.' Mendenhall has failed to show that a 'taking' of his property for public use without compensation to him has occurred." *Id.* (quoting *Galbraith v. Planning Dep't of Anderson*, 627 N.E.2d 850, 854 (Ind. Ct. App. 1994)).

At issue in *Galbraith v. Planning Department of the City of Anderson*, 627 N.E.2d 850 (Ind. Ct. App. 1994), was a zoning

(continued...)

inverse condemnation cases such as *Georgetown*, 786 N.E.2d at 1139, state that there are two categories of takings: physical invasion takings and takings that deprive the owners of all economically beneficial use of their property. There is no indication in Indiana law that owners who suffer a physical invasion also must lose all economically beneficial use of their property in order to bring an inverse condemnation action. Consequently, we believe that the statements in *Mendenhall* and *Galbraith*, when placed in the correct factual and legal context, do not apply to physical-invasion takings.

Therefore, in contrast to the situation in *Daniels*, we have failed to find any cases indicating that Indiana would not recognize a state action for a physical-invasion taking. Indeed, all indications are that plaintiffs have a state remedy—a state inverse condemnation action—which they have not pursued. We must conclude, therefore, that the plaintiffs have not exhausted their state remedies as required by *Williamson County*, and their takings claim is not properly before this court.

---

(...continued)

ordinance that restricted the plaintiff's use of his property. In determining whether the zoning ordinance constituted a taking, the court stated that "a zoning regulation 'goes too far,' that is, is confiscatory, when it denies the property owner 'all economically beneficial or productive use of the land.' " *Id.* at 853 (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992)).

Thus, the statements that an owner must show that all economically beneficial use of property has been lost before instituting a state inverse condemnation action arose in the context of regulations on the use of property, not in the context of a physical invasion of property.

### D.  Procedural Due Process

The plaintiffs argue that the DNR deprived them of their property without due process of law when it caused the dredged material from the supply pond to invade and destroy their property. Although not discussed by the parties, our case law explains that the *Williamson County* exhaustion requirement applies with full force to due process claims (both procedural and substantive) when based on the same facts as a takings claim. *See Hager v. City of West Peoria*, 84 F.3d 865, 869 (7th Cir. 1996) (stating that "[t]he exhaustion requirement of *Williamson County* applies whether plaintiffs claim an uncompensated taking, inverse condemnation, or due process violation" and thus the plaintiffs were required to "first pursue their claims, whether in the form of a takings challenge or a due process claim, in . . . state court").[33] We have explained that, although we recognize that a governmental taking of property may encompass due process concerns, nevertheless, "due process challenges are premature if the plaintiff has not exhausted possible state remedies by which to attack the zoning regulation or other state action" creating the taking. *Covington Ct. Ltd. v. Vill. of Oak Brook*, 77 F.3d 177, 179 (7th Cir. 1996). Thus, the plaintiffs' procedural due process claim

---

[33] *See also River Park, Inc. v. City of Highland Park*, 23 F.3d 164, 167 (7th Cir. 1994) (noting that "[l]abels do not matter" and holding that a plaintiff could not avoid *Williamson County*'s exhaustion requirement simply by adopting the label of "procedural due process"); *Forseth*, 199 F.3d at 370 (explaining that a "substantive due process claim [that] falls within the framework for takings claims" is "subject to *Williamson*'s requirement that [the plaintiffs] seek a final decision and pursue state court remedies before federal courts have jurisdiction to hear their case").

based on a deprivation of a property interest also is barred from federal review.[34]

## Conclusion

For the foregoing reasons, the judgment of the district court with respect to the CWA claim is reversed, and that claim is remanded for further proceedings consistent with this opinion. The judgment of the district court with respect to the plaintiffs' takings and procedural due process claims is affirmed. The plaintiffs may recover their costs in this court.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*

---

[34] Additionally, because we find that plaintiffs have failed to exhaust their administrative remedies, we need not and do not address the issue of whether the draw-down of the pond was a random, unauthorized act or whether the DNR employees possessed the requisite intent to establish a due process violation.